**Patsy D. SHIREY, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 82–1639–15.**

United States District Court,
D. South Carolina,
Columbia Division.

March 19, 1984.

**1252**

Patricia M. Wark, Lexington, S.C., for plaintiff.

John B. Grimball, Asst. U.S. Atty., Columbia, S.C., for defendant.

## ORDER

HAMILTON, District Judge.

This lawsuit arises out of a tragic automobile accident which occurred in the early morning hours of May 31, 1981, on Platt Springs Road in Lexington County, South Carolina. The plaintiff, Patsy D. Shirey, was driving a 1971 surplus postal jeep, an American Motors DJ–5B which she had purchased from the United States Postal Service on August 6, 1979, when she encountered an unexpected obstacle in the roadway. To avoid the obstacle, the plaintiff steered to the right and then back to the left to avoid a power pole. Unfortunately, during this maneuver the jeep overturned, pinning Mrs. Shirey's right arm under the vehicle as it skidded on its side. As a result of the accident and the injury sustained, Mrs. Shirey's right arm had to be amputated some 6 to 7 inches below the elbow.

■ By complaint filed June 30, 1982, the plaintiff instituted the instant action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671–2680, contending that the United States, through the United States Postal Service (hereinafter "Postal Service"), was negligent in failing to warn the plaintiff of the jeep's alleged "known" propensity to easily rollover. Through its amended answer of November 4, 1982, the defendant asserted the following defenses: (1) that the complaint failed to state a claim upon which relief could be granted, (2) that the district court lacked jurisdiction pursuant to the provisions of the Tucker Act, 28 U.S.C. § 1346(a)(2), (3) that the plaintiff's allegations of misrepresentation were barred by 28 U.S.C. § 2680(h), (4) contributory negligence, (5) assumption of the risk, (6) negligence of others, (7) the sole negligence of the plaintiff, and (8) that the claim was barred by the "discretionary function"

exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).[1]

The matter came before the court, sitting without a jury, for trial February 21–24, 1984, in Columbia, South Carolina. After receiving the testimony, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. The court notes that to the extent any of the following findings of fact constitute conclusions of law, they are

adopted as such and to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FACTUAL FINDINGS

Patsy D. Shirey, a citizen and resident of Lexington County, South Carolina, acquired a 1971 DJ–5B surplus jeep from the Postal Service on August 6, 1979. She purchased the jeep for use as a delivery vehicle on her two paper routes, having been primarily attracted to the vehicle due to its right-hand drive feature. The jeep

1. At the pre-trial of this matter, held on February 2, 1984, the plaintiff's counsel acknowledged that 28 U.S.C. § 2680(h) precluded claims against the United States based on misrepresentation and thereby, voluntarily abandoned the second cause of action asserted in the complaint.

Additionally, at the pre-trial and again on the morning of the first day of trial, February 21, 1984, the plaintiff's counsel objected to the defendant's assertion of the eighth affirmative defense, the "discretionary function" exception set forth in 28 U.S.C. § 2680(a). Plaintiff's counsel contended that by this court's order of October 20, 1982, the defendant was granted leave to amend its answer *only* to set forth the affirmative defenses of negligence of others and the sole negligence of the plaintiff. However, by letter of November 4, 1982, the defendant's counsel advised the plaintiff's counsel of the following:

Shortly after filing the Notice of Motion to Amend Defendant's Answer, dated October 14, 1982, I was contacted by the attorney for the United States Postal Service who is involved in this matter and was requested to include as a defense the "discretionary function" exception to the Federal Tort Claims Act which is found in 28 U.S.C. § 2680(a). Rather than make a second motion to the Court to amend the Answer to include this defense, I took the liberty of including that defense in my Amended Answer as the "Eighth and Affirmative Defense". *Technically, this defense has been submitted without authority of the Court and for that reason I wanted to specifically call it to your attention. If you would like me to go ahead and make the necessary motion to the Court, I will certainly do so. However, I would appreciate your letting me know at an early time if that is what you request.* (emphasis added).

From November, 1982, until February 2, 1984, no objection to the inclusion of the defendant's eighth defense was ever made known to the court or to the defendant's counsel by the plaintiff or her counsel. Instead, the plaintiff's

counsel contended that she "relied" upon the provisions of Rule 15(a) of the Federal Rules of Civil Procedure. That rule provides that after a party's right to amend a pleading as a matter of course expires, "a party may amend his pleading only by leave of court or by *written consent of the adverse party;* ..." (emphasis added).

The plaintiff's counsel acknowledged that she received Mr. Grimball's letter of November 4, 1982, but contended that she did not respond to it due to his failure to comply with Rule 15(a). In opposition to the plaintiff's position, Mr. Grimball asserted that regardless of Rule 15, the "discretionary function" exception set forth in 28 U.S.C. § 2680(a) was encompassed in his first defense of failure to state a claim upon which relief could be granted and that it also went specifically to the court's jurisdiction of the plaintiff's claim.

The court allowed the eighth defense to stand as asserted. As set forth in 6 Wright and Miller, Federal Practice and Procedure § 1490, "Despite the express requirement in Rule 15(a) that the consent be written, at least one court has held that a party may be *estopped* from denying that he consented to a proposed amendment when his actions indicate the contrary, even though there is no written evidence of it." (emphasis added). *Id.* at 452. The fifteen month acquiescence of the plaintiff's counsel to the amended answer, especially in view of the numerous opportunities plaintiff's counsel had to bring this matter to the attention of the court, falls squarely within the reasoning of *Schwartz v. Pattiz,* 41 F.R.D. 456 (D.C.Mo.1967), *aff'd* 386 F.2d 300 (8th Cir.1968).

Additionally, the court was persuaded by the jurisdictional nature of the "discretionary function" exception. As set forth by the Tenth Circuit Court of Appeals in *Baird v. United States,* 653 F.2d 437, 440 (10th Cir.1981), "[The discretionary function exception] poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." The lack of subject matter jurisdiction by this court may not be waived and may be raised at any time.

was sold on an "As Is Where Is" basis, without any warranties being extended, at the Main Post Office on Assembly Street in Columbia, South Carolina. (Joint Ex. # 7). Prior to sale, the jeep was inspected by Patrick H. Ussery, a Postal Service mechanic, and was found to be in good repair. Additionally, before the jeep was sold, Mr. Ussery safety inspected it pursuant to South Carolina law. Mr. Ussery knew the plaintiff personally and after the sale of the vehicle he assisted her, during his off-duty time, in keeping the vehicle in repair. Among other repairs, Mr. Ussery replaced the jeep's transmission and the engine and transmission mounts, repaired a brake problem and worked on the vehicle's carburetor.

Mrs. Shirey drove the used jeep with satisfaction for over twenty-one months and for 56,823 miles. However, while travelling down a two-laned paved road shortly before 3:00 a.m. on Sunday, May 31, 1981, on her way to deliver newspapers, the plaintiff unexpectedly encountered an obstacle in her lane of travel. The obstacle was a small construction barricade placed in the road by pranksters who have never been identified. (Joint Ex. # 11). The testimony revealed that the plaintiff was travelling about 25 miles per hour and noticed the obstacle from a distance of approximately 24 feet. As she approached the barricade, she smoothly steered to the right to avoid the obstacle and then back to the left to avoid hitting a power pole. As the plaintiff pulled back to the left, the jeep lifted up and turned over on its right side, pinning her right arm underneath it as it skidded approximately 25 feet.

The United States Postal Service operates a fleet consisting of approximately 128,000 owned vehicles, an additional 13,-000–14,000 leased vehicles and 13,000–14,-000 "standby" leased vehicles. Of those figures, approximately 70–75% are DJ–5 series jeeps. Mr. Robert K. St. Francis, Director of the Office of Fleet Management, testified extensively as to the management hierarchy within the postal system, the policies surrounding the procurement and disposal of DJ–5 vehicles and as to his actions with regard to an investigation of the DJ–5.

A recitation of the Postal Service hierarchy is essential to an understanding of Mr. St. Francis' position therein and the impact of his actions on the instant case. The Postal Service is governed by an eleven member Board of Governors consisting of nine members who are appointed by the President of the United States and confirmed by the Senate, the Post Master General and the Deputy Post Master General.[2] The eight or nine Senior Assistant Post Master Generals and the executive officers, including the Chief Postal Inspector, the Judicial Officer and the Consumer Advocate, all report directly to the Post Master General. The Assistant Post Master Generals report to the Senior Assistant Post Master Generals and the Postal Career Executive Service (hereinafter "PCES"), Levels 2 and 1 report to the Assistant Post Master Generals. The PCES, Level 2's are analogous to the officers of a corporation.[3] Mr. St. Francis, a PCES, Level 1, reports directly to the Assistant Post Master General for Delivery.[4]

As Director of the Office of Fleet Management, Mr. St. Francis is responsible for the Postal Service's entire fleet, from acquisition to disposal. He oversees the design of the fleet maintenance facilities, sets performance and design requirements for the fleet, is responsible for accident investigation and determines procurement and

---

Rule 12(h)(1) and (3) Federal Rules of Civil Procedure.

**2.** The Post Master General is selected by the Board of Governors and the Deputy Post Master General is selected by the Post Master General and then confirmed by the Board of Governors.

**3.** A PCES, Level 1 is lower on the hierarchical scale than a PCES, Level 2. There are approximately 40 PCES, Level 2's and approximately 60 PCES, Level 1's.

**4.** Under the Assistant Post Master General for Delivery there are three directors, the Director of Retail and Delivery, the Director of Address Information Systems and the Director of the Office of Fleet Management, currently Mr. St. Francis.

disposal policies, including the surplus sales program. Mr. St. Francis has the authority to suspend the surplus sales program for a period of time, but doubts his authority to completely eradicate the sales program.

In order to maximize return on investment, and thereby reduce costs, the Postal Service is authorized by Congress to dispose of surplus property pursuant to the provisions of 39 U.S.C. § 401(5).[5] Since approximately 1974, the Postal Service has sold 30,000 to 40,000 surplus DJ–5 vehicles to the public.[6] Under the vehicle replacement policy enunciated in 1979, DJ–5 jeeps are generally sold to the public after eight years of service or 40,000–50,000 miles. However, this policy is not mandatory and other regulations may permit a vehicle's removal from service earlier. The vehicles are authorized to be sold at vehicle maintenance centers located throughout the country. However, decisions pertaining to what information is to be made available to the public on used vehicles, just as the general disposal policies, are made at the national headquarters by the Office of Fleet Management. The regional services branch is then granted some administrative discretion in implementing the nationally directed policies.

Mr. St. Francis first became aware of a "jeep rollover" problem when he viewed a CBS "60 Minutes" program on the AMC CJ–5 vehicles on December 21, 1980. The program caused Mr. St. Francis concern and alarm due to the "sensationalism" of the CBS report and due to the perceived visual similarities between the CJ–5 vehicle and the DJ–5 series in use by the Postal Service. In anticipation of repercussions and perhaps inquiries to the Postal Service from Congressmen, unions and postal workers, Mr. St. Francis, on December 22, 1980, requested data to be extracted from the Postal Service's computerized 1769 accident reports in an effort to discern whether there was a similar rollover problem with the DJ–5 vehicles.[7] In order to extract this specific information from the 1769 forms, Mr. St. Francis requested personnel from the Employee Relations Department and the Office of Safety and Health to design a new computer program.[8] The first statistics from the program were transmitted to Mr. St. Francis' office in early February of 1981. (Joint Ex. # 8). After review by his staff, it was determined that there were inaccuracies in the statistics, particularly in the statistics reflecting the total fleet size, and the statistics were returned for re-compilation. On August 20, 1981, the Office of Fleet Management was provided comprehensive information pertaining to postal vehicle rollover incidents for calendar years 1977 through 1980. (Plaintiff's Ex. # 4). From this information Mr. St. Francis' office prepared a compilation of the data and concluded that there was a 30–35 percentile characteristic difference of other postal vehicles being more likely to rollover than the DJ–5 jeep. (Defendant's Ex. # 4).

Additionally, after the December, 1980, television show, Mr. St. Francis took several other steps in an effort to determine whether the DJ–5 had a "rollover propensi-

---

**5.** Section 401(5) provides:

The Postal Service shall have the following general powers:

(5) to acquire, in any lawful manner, such personal or real property, or any interest therein, as it deems necessary or convenient in the transaction of its business; to hold, maintain, sell, lease or otherwise dispose of such property or any interest therein; and to provide services in connection therewith and charges therefor; ...

**6.** Prior to 1974 the General Services Administration was responsible for the disposal of surplus postal vehicles.

**7.** The Postal Service maintains an accident reporting system through its 1769 forms. When a postal worker is injured, whether as the result of a cut finger, a fall, or an automobile accident, a 1769 form is filled out by the employee's supervisor. (Defendant's Ex. # 5). The information, with regard both to personal injury and property damage, on the 1769 form is transmitted to national headquarters and stored in the Postal Service computers.

**8.** Initially the requested data was being manually extracted from the 1769 reports until Mr. St. Francis "demanded" computer programs for developing the data.

ty" similar to that of the CJ–5. On December 22, 1980, Mr. St. Francis requested the five regional offices of the postal system to send him data on the last five to ten rollovers in each region. This information was compiled from a series of form 1700 accident investigation reports.[9] Mr. St. Francis subsequently received the information and concluded that the majority of the accidents reported by the regions were attributable to operator error. Additionally, at sometime subsequent to December 22, 1980, but prior to May of 1981, Mr. St. Francis commissioned the Postal Service's Research and Development Department to conduct a comparative analysis of the CJ and DJ vehicles. However, the results of this study were not made known to the court. Also, under Mr. St. Francis' direction, the Postal Service developed a rollover portfolio in a continuing effort to evaluate the performance of the DJ vehicles.

Two additional studies which the plaintiff felt were crucial to her case were studies prepared for the United States Postal Service by Cornell Aeronautical Laboratory, Inc., in July of 1971 and October of 1972.[10] (Joint Ex. ## 1, 2). Both the 1971 and 1972 studies reviewed four basic tests of the vehicle's performance: (1) Static Rollover; (2) Steady State Steering Characteristics and Maximum Lateral Acceleration; (3) Transitional Behavior (Serpentine); and (4) Emergency Maneuvering (Lane Change).[11] In the summary of results and conclusions found at Section 3.0 of the 1971 study, the following pertinent statements were made:

1. In the normal range of operations (i.e., at lateral accelerations below .3g), the test vehicle exhibited reasonable stability and control characteristics, comparable in all respects with current passenger automobiles.

4. The roll sensitivity of the test vehicle, as determined in both static and dynamic tests, is about $9\pm1$ deg./g. This value *is within the range in which most passenger automobiles fall and is superior to the roll sensitivity of most other light delivery trucks.* (emphasis added).

6. Compared with most passenger automobiles, the test vehicle has a very high value of center-of-gravity height to wheel track ratio (a factor of two difference) and this tends to reduce its rollover immunity. *However, the ratio is comparable to that of most other light delivery trucks* .... (emphasis added).

12. Based on some 600 miles of driving during the test program, the vehicle was subjectively appraised by the test driver as inferior to passenger cars with respect to ride and comfort and convenience. Nevertheless, over the course of the test work, he developed a level of confidence in the overall drivability of the vehicle that supports an opinion that the vehicle is reasonably well-suited to its mission.

The 1972 study was then performed to evaluate the effect several modifications would have on the overall performance of the vehicle. The modifications considered were: (1) extending the rear axle track; (2) changing the tire mix; and (3) adding a stabilizer bar to the front suspension. As noted in the 1972 study, some of the proposed modifications would involve significant structural changes and therefore, a high cost for conversion of Postal Service vehicles of this type already in use. For

---

**9.** The 1700 form differs from the 1769 form in that it is filled out by professional accident investigators skilled in accident analysis as opposed to being filled out by the injured party's supervisor.

**10.** The July, 1971, study, *Test and Evaluation of a ¼-Ton Light Delivery Vehicle* was prepared by R.S. Rice and A.F. Brayman. The October 1972,

study, *Test and Evaluation of a Modified ¼-Ton Postal Service Light Delivery Vehicle,* was prepared by R.S. Rice and T.T. Kunkel.

**11.** The 1971 study also involved tests of the Steering Wheel Force and Displacement and Braking and Acceleration Capability.

that reason, the Postal Service elected to evaluate the use of a stabilizer bar as a first objective. In the summary of results and conclusions found at Section 3.0 of the 1972 study, the following finding with regard to the stabilizer bar's effect on dynamic rollover was made:

(2) Since no modifications affecting the height of the center-of-gravity or track width of the vehicle were made, *the rollover margin* (i.e., the difference between the lateral acceleration value for rollover and the maximum controllable lateral acceleration) *is unchanged* by the addition of the stabilizer bar. In fact, this margin is slightly reduced for high load configurations because of the small increase in achievable lateral acceleration.

The finding of the 1972 study did not, therefore, modify the overall conclusions of the earlier Cornell study as to suitability for use or the general performance of the vehicle. At best, the conclusions of both studies indicated that the quarter ton vehicles had handling characteristics typical of most light delivery trucks. The studies in no way indicted the vehicle as a serious safety hazard.[12]

Prior to the date of the plaintiff's accident, the Office of Fleet Management had received no complaints on the DJ-5 jeeps from the three major national unions representing postal drivers, the Mailhandlers Union, the National Association of Letter Carriers Union, and the American Postal Workers Union. Additionally, Mr. St. Francis serves as chairman of the Interdisciplinary Committee on Fleet Safety which is organized under the Department of Labor and reports to the federal division of the Occupational Safety and Health Administration. In the course of its efforts to identify areas of causation of federal workmen's compensation cases, the alleged rollover "propensity" of the DJ-5 was never brought to the committee's attention.[13]

Prior to May 31, 1981, Mr. St. Francis was aware of the death of a Postal Service employee due to a multiple vehicle rollover of the DJ-5, but not of any private individuals.[14] Additionally, he was not aware of any single vehicle DJ rollovers involving Postal Service employees or others prior to May 31, 1981, but he assumes that there were some. Mr. St. Francis also testified that although the Postal Service has a procedure for notifying employees of safety hazards known as the "deadline program," no warning was issued through this system to postal drivers concerning the DJ-5 vehicle prior to May 31, 1981.

Prior to May 31, 1981, the Postal Service issued no warnings to the general public with regard to the DJ-5 jeeps. Based on the statistics, information and studies available at that time, Mr. St. Francis concluded that there was no sufficiently established "rollover propensity" to warrant the costly and difficult task of notifying all of the surplus jeep purchasers throughout the nation.[15] Indeed, he determined that other

---

12. The Postal Service presumably had the two Cornell studies on file, but Mr. St. Francis, who assumed his present position on June 1, 1980, was not aware of the studies until after May 31, 1981. He also was neither aware of any modifications to the vehicles which resulted from the studies nor did he have information as to why the studies were originally commissioned.

13. Mr. St. Francis serves on several other safety boards, including the Advisory Council for Motor Vehicle Transportation under the Department of Transportation. However, he testified that prior to May 31, 1981, he received no information through those boards on the DJ-5 "rollover propensity."

14. Testimony at trial revealed the existence of a 1974 memo filed by a Mr. Lloyd Vincent, a

postal worker, regarding ten alleged rollovers of DJ-5 vehicles in the Postal Service's western region. This document was not produced to the plaintiff through the regular course of discovery, but was independently discovered through plaintiff's counsel's review of a deposition taken of Mr. St. Francis in an unrelated case. Efforts were made at trial by the defendant to locate the document to no avail.

Mr. St. Francis did not become aware of the Vincent memo until discovery was initiated in the instant action.

15. Since the first marketing of the DJ-5 vehicles in 1974, some 30,000–40,000 surplus vehicles have been sold to the general public. The Postal Service maintains records of the purchasers of its vehicles and therefore, it would have been

vehicles in the postal fleet had a greater propensity to roll than did the DJ–5's.[16]

## CONCLUSIONS OF LAW

[2, 3] This court has jurisdiction of the instant action pursuant to the provisions of the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671–2680, and 28 U.S.C. § 1346(b). The plaintiff duly filed her administrative claim with the Postal Service on June 25, 1981. (Plaintiff's Ex. #12). This claim was denied by letter, pursuant to the provisions of 28 U.S.C. § 2675(a), on January 8, 1982. (Joint Ex. #13). The plaintiff then filed the complaint in the instant action on June 30, 1982. The focus of the plaintiff's claim is that the defendant Postal Service negligently and wilfully failed to warn her of the DJ–5B's alleged "known" rollover propensity at the time of sale or at any time prior to her May 31, 1981, accident.[17] The government's position is that the acts of the Postal Service in deciding to sell the surplus vehicles in an "as is where is" condition was a decision involving policy judgment and is, therefore, within the discretionary function exception to liability

under the FTCA.[18] 28 U.S.C. § 2680(a). The court concludes however, that the decision to sell postal vehicles to the general public is a discretionary function, and also, that the decision of Mr. Robert K. St. Francis not to issue a warning (prior to May 31, 1981) is the very type of policy decision § 2680(a) is designed to protect.

The FTCA waives the United States' sovereign immunity "in sweeping language," *United States v. Yellow Cab Co.,* 340 U.S. 543, 547, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951). As 28 U.S.C. § 1346(b) provides:

Subject to the provisions of chapter 171 of this title, the district courts, ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

feasible, though costly, to issue warnings to all owners in 1981. Warnings were, in fact, issued to all DJ–5 purchasers in April of 1982 based on the following additional information obtained by the Office of Fleet Management subsequent to May 31, 1981. As noted previously, the 1769 form statistical compilation that Mr. St. Francis had requested from the Office of Safety and Health was not received by him in final form until August 20, 1981. (Plaintiff's Ex. #4). On November 6, 1981, Mr. St. Francis viewed a program on DJ–5 rollover propensity on "NBC Magazine." On November 12, 1981, Mr. St. Francis directed his staff to step up their investigation of the DJ's and at some time subsequent to November 12, 1981, Mr. St. Francis contacted American Motors General Corporation. In December of 1981, Mr. St. Francis read an article in the Wall Street Journal on the DJ–5 rollover problem. On March 15, 1982, Mr. St. Francis suspended the sales of the DJ vehicles until May of 1982, at which time warning letters as to the vehicle's rollover propensity had been issued to purchasers and warning stickers had been developed. (Although not in evidence, the Federal Trade Commission and American Motors Corporation entered into a consent agreement in February, 1982, with regard to the handling characteristics and advertising of DJ–5 vehicles.

Mr. St. Francis was not aware of the consent agreement in that action until the trial of this case.)

16. In view of the testimony of Mr. St. Francis, the court would have allowed an amendment of the answer to conform to the evidence going to the "discretionary function exception" even if it had not allowed the Rule 15(a) amendment as previously discussed in footnote 1. Rule 15(b) of the Federal Rules of Civil Procedure.

17. Under a negligence theory of failure to warn, the duty is continuous and is not interrupted by the manufacture or sale of the product. *Bly v. Otis Elevator Co.,* 713 F.2d 1040 (4th Cir.1983).

18. In her *Memorandum of Law Re: Discretionary Function Exception to FTCA* the plaintiff raised the issue of the first exception set forth in § 2680(a), that of the exercise of due care in executing a statute or regulation. The defendant did not, however, raise this provision as a defense. Additionally, the court agrees with the rationale of the case of *Stewart v. United States,* 486 F.Supp. 178 (D.Ill.1980), wherein the court held the "due care" exception inapplicable to a case factually similar to the instant action.

However, this broad waiver of sovereign immunity is limited in part by the discretionary function exception of 28 U.S.C. § 2680(a). Section 2680(a) provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.* (emphasis added).

Although exceptions to the FTCA are to be narrowly construed, the discretionary function exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." *Baird v. United States*, 653 F.2d 437, 440 (10th Cir.1981); *First National Bank in Albuquerque v. United States*, 552 F.2d 370, 376 (10th Cir.1977); and *Smith v. United States*, 546 F.2d 872, 877 (10th Cir.1976). If the discretionary function exception is applicable, the provisions of Chapter 171 and section 1346(b) will not apply and the district court must dismiss the case for lack of subject matter jurisdiction. *Smith*, 546 F.2d at 876 (citing, *Morris v. United States*, 521 F.2d 872, 875 (9th Cir.1975).

In the 1953 case of *Dalehite v. United States*, 346 U.S. 15, 26, 73 S.Ct. 956, 963, 97 L.Ed. 1427, the United States Supreme Court held that claims against the Government for its negligent planning and handling of shiploads of fertilizer, which had

exploded, were barred by the discretionary function exception of § 2680(a). In so holding, the Court defined the limits of the exception as follows:

[T]he 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Where there is room for policy judgment and decision there is discretion.* (emphasis added). Id. at 35–36, 73 S.Ct. at 967–68.

In reaching this definition, the Court also noted:

The "discretion" protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. *It is the discretion of the executive or the administrator to act according to one's judgment of the best course,* a concept of substantial historical ancestry in American law. (emphasis added). *Id.* at 34, 73 S.Ct. at 967.

In applying the discretionary function exception, the Tenth Circuit Court of Appeals has stated that, "[g]enerally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." *Miller v. United States*, 710 F.2d 656, 663 (10th Cir. 1983) (quoting *Jackson v. Kelly*, 557 F.2d 735, 737–38 (10th Cir.1977) (en banc)).[19] Similarly, the Tenth Circuit has also asserted:

[T]he rule is that if a government *official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the*

---

19. In decisions dealing with the exception of § 2680(a), the courts have drawn a distinction between negligence at the operational level and the exercise of a discretionary function at the executive or management level. *Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953); *Indian Towing Co., Inc. v.*

*United States*, 350 U.S. 61, 64, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955); *Nevin v. United States*, 696 F.2d 1229 (9th Cir.1983); *S.A. Empresa De Viacao Aerea Rio Grandense v. United States*, 692 F.2d 1205 (9th Cir.1982); *Madison v. United States*, 679 F.2d 736 (8th Cir.1982); and *Gross v. United States*, 676 F.2d 295 (8th Cir.1982).

*decision he makes is discretionary and within the exception of the Tort Claims Act.* Conversely, if there is a standard by which his action is measured, it is not within the exception. *The statute provides that if the act of the official is discretionary it is not actionable even though the discretion is abused.* (emphasis added). *Id.* at 979.

In the instant action, the 1971 surplus DJ–5B vehicle was sold to Mrs. Shirey pursuant to the following language of 39 U.S.C. § 401(5): "The Postal Service shall have the following general powers: ... to hold, maintain, sell, lease or otherwise dispose of such property ...." The decision of the Postal Service to sell surplus vehicles, in order to dispose of them and in order to realize a maximum return on the investment, clearly involved policy considerations at the highest level, decisions that cannot result in tort liability for the Government. *Stewart v. United States,* 486 F.Supp. 178, 184 (C.D.Ill.1980). In *Stewart,* the plaintiff brought suit against the United States for injury and death allegedly resulting from the government's selling asbestos from national stockpiles without warning of its dangers. The district court held that the sale of asbestos, as authorized by Congress, was clearly the type of policy decision that § 2680(a) was designed to protect. However, the court went on to note that:

> The decision to sell the asbestos "as-is" and without warnings or warranties, however, must be examined separately in order to determine the applicability of Section 2680(a). *Stephens v. United States,* 472 F.Supp. 998, 1009 (C.D.Ill. 1979).
>
> ....
>
> ... The policy judgment analysis used in determining whether an activity is within the discretionary function exception is equally applicable to the contested decision in the case at bar. *Id.* at 184.

After reviewing the reasons for the Government's failure to include a warning on the crates of asbestos, primarily the costs involved, the court concluded that the Government's decision was a policy consideration and therefore, protected by the discretionary function exception. *Id.* at 185.

In a January 24, 1984, order in the case of *Ford v. American Motors Corporation, et al.,* C.A. No. H–81–1922 (S.D.Tex.1984), the Honorable Carl Bue dismissed the United States in a similar postal vehicle "rollover" suit on the basis of the discretionary function exception set forth in § 2680(a). In reaching this decision, Judge Bue noted that the Postal Service's Office of Fleet Management had evaluated the DJ–5B's performance, determined that the vehicle was not defective and had, in fact, continued to order vehicles which were substantially similar in design. In conclusion Judge Bue held:

> [T]his action must be dismissed as to the United States because the conduct complained of was action taken in the exercise or performance of a discretionary function. The Postal Service evaluated the performance of the vehicles, made the judgment that they performed satisfactorily as light delivery trucks without modification, and concluded that no particular "warning" was required. This exercise of discretionary authority and judgment cannot be challenged through the medium of a tort suit. *Id.* at 8.

The court is persuaded by the rationale of *Stewart* and *Ford* and does hereby concluded that the decision to sell surplus postal vehicles was a discretionary function within the ambit of § 2680(a). The decision was made at the highest level of the Postal Service's management and involved policy considerations of practicability, feasibility and economy.

■ Additionally, in the instant case, the evidence clearly reveals that in deciding not to issue a warning to the purchasers of surplus postal DJ–5B jeeps between December 21, 1980, and May 31, 1981, Mr. Robert K. St. Francis, Director of the Office of Fleet Management, performed a discretionary function, exempt from liability by virtue of § 2680(a). Also, the court concludes that irrespective of § 2680(a), from the date of sale, August 6, 1979, until

December 21, 1980, the Postal Service was under no conceivable duty to warn the general public of a rollover propensity because as a matter of law, the defendant had no sufficient knowledge of such a problem as to impose such a duty.[20] As the Fourth Circuit Court of Appeals noted in the case of *Gardner v. Q.H.S., Inc.*, 448 F.2d 238 (1971), in South Carolina a supplier or manufacturer of a chattel is liable in negligence to all whom they should expect will use the chattel or be endangered by its use if, "(a) *they know or have reason to know that the chattel is or is likely to be dangerous* for the use for which it is supplied, (b) they lack reason to believe that the user will realize the potential danger, and (c) they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. 2 Restatement of Torts, 2d §§ 388 and 395 (1965 Ed.)." (emphasis added). *Id.* at 242. The Postal Service, prior to December 21, 1980, had neither knowledge nor reason to have knowledge of a rollover problem.

However, between December 21, 1980, and May 31, 1981, Mr. St. Francis' attention, at least, was drawn to the possibility of a rollover problem with the DJ–5B vehicles. Having decided that the Postal Service's decision to sell surplus postal vehicles was a discretionary function under § 2680(a), the court in reaching its conclusions, must separately examine the decision not to issue warnings to surplus vehicle purchasers prior to May 31, 1981. *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976). Clearly, Mr. Robert K. St. Francis, Director of the Office of Fleet Management, was operating within the scope of his authority as an executive of the Postal Service. *Birnbaum v. United States*, 588 F.2d 319 (2d Cir.1978). The decision he made prior to May, 1981, that there was no

rollover problem with the DJ–5 vehicles and that warnings to postal service employees or to the general public were unnecessary, was based on the studies and information he had before him.[21] While he may have questioned the safety of the vehicles and their rollover propensity, his decision not to ban their use or warn of their danger, was made after careful evaluation of the information available at the time and an assessment of the costs and difficulty of sending notices to surplus vehicle purchasers. This decision is clearly "the type of policy determination for which the government is protected from liability under the discretionary function exception." *George v. United States*, 703 F.2d 90, 92 (4th Cir.1983). Mr. St. Francis was faced with making a decision based on incomplete and insubstantial information as to the rollover propensities of the DJ–5B. In the face of that he had to balance the practicability and feasibility, including costs, of issuing warnings to thousands of individual surplus vehicle purchasers. *Callas' Estate v. United States*, 682 F.2d 613 (7th Cir.1982). Even if it could be said that his decision not to warn, based on the information available to him prior to May 31, 1981, was an abuse of his discretion, it is, nonetheless, still an exercise of discretion protected by § 2680(a). *Spillway Marina, Inc. v. United States*, 445 F.2d 876, 878 (10th Cir.1971).

The plaintiff cited several cases to the court which concededly, at first blush, would seem to require a different holding. However, the court has reviewed the cited cases thoroughly and finds them to be distinguishable from the instant case. The plaintiff first cites several Fourth Circuit opinions which stand for the proposition that, "once the government has exercised its discretion and has decided to proceed in

---

**20.** Based on the evidence presented to the court, prior to December 22, 1980, the only information that the defendant had consisted of the 1971 and 1972 Cornell studies (Joint Ex. ## 1, 2) which indicated that the vehicles were well-suited to their intended use and had a roll sensitivity superior to that of most other light delivery trucks.

**21.** The 1971 and 1972 Cornell studies (Joint Ex. ## 1, 2), the December 21, 1981, "60 Minutes" segment on CJ–5 vehicles, data from the Postal Service's 1769 forms which was returned for inaccuracies, information from the regional offices of their 10 most recent rollovers as reflected in the 1700 accident investigation report forms.

a matter, then the government is liable for negligent acts done in the course of such proceedings." *S. Schonfeld Company, Inc. v. SS Akra Tenaron*, 363 F.Supp. 1220, 1221 (1973); *White v. United States*, 317 F.2d 13 (4th Cir.1963); and *Somerset Seafood Co. v. United States*, 193 F.2d 631 (4th Cir.1951). Of the three, the factual situation in *Somerset* is perhaps the most analogous to the case at hand. In *Somerset*, the Fourth Circuit held the Government liable for the negligent marking of a wrecked vessel which resulted in damage to the plaintiff's ship. In addressing the discretionary function exemption the court stated:

> In addition to this, we think that, even if the decision to mark or remove the wreck be regarded as discretionary, there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. *Id.* at 635.

Similarly, the plaintiff places great reliance on the Tenth Circuit decision of *Smith v. United States*, 546 F.2d 872 (10th Cir.1976) wherein a 14-year-old visitor to Yellowstone National Park sued for injuries he sustained when he fell into an unmarked superheated thermal pool. In that case, the court held that the Government's policy decision to designate certain areas of the park "undeveloped" did not absolve the Government, as a landowner, of the duty to warn of the *known* danger of a thermal pool. (emphasis added).

In both of these cases, the danger was *known*, was *absolute*. (emphasis added). By virtue of the Government's assumption of the position of a protector in *Somerset* and by its position as landowner in *Smith*, certain concomitant duties to warn of *known* dangers arose. There was no discretion, no policy decision, no exercise of judgment involved. As noted earlier, "if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary ... conversely if there is a standard by which his action is measured, it is not within the

exception." *Barton v. United States*, 609 F.2d 977, 979 (10th Cir.1979).

The Government in the instant case was faced with an unknown, the possibility of a rollover propensity in the DJ–5B vehicle. The Government gathered available information on the DJ–5 series, evaluated it and, prior to May 31, 1981, determined that there was no problem with the vehicle and no need to issue a warning to the general public or to its own employees. This was the exercise of a discretionary function for which the Government may not be held liable under the Federal Tort Claims Act, 28 U.S.C. § 2680(a). For the foregoing reasons and based on the cited authorities it is

THEREFORE ORDERED that the complaint of Mrs. Patsy D. Shirey against the United States of America be, and the same hereby is, dismissed.