**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**Bankruptcy Nos. 86 B 11270 (BRL) to 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).**

United States Bankruptcy Court, S.D. New York.

Oct. 21, 1991.

As Corrected Oct. 25, 1991.

Kaye, Scholer, Fierman, Hays & Handler by Herbert S. Edelman, Steven E. Fox, Skadden, Arps, Slate, Meagher & Flom by Bert L. Wolff, Gary E. Crawford, Katherine Armstrong, New York City, for debtors.

Paul William Beltz, P.C. by Kevin J. Sullivan, Buffalo, N.Y., for claimants Seufert, Willis and MacNeil.

Harvey, Pennington, Herting & Renneisen by William G. Adamson, Philadelphia, Pa., for claimant Robert Rodgers.

MEMORANDUM DECISION ON THE MOTION FOR SUMMARY JUDGMENT TO DETERMINE THE APPLICABILITY OF THE GOVERNMENT CONTRACTOR DEFENSE TO CLAIMS BASED ON POSTAL DISPATCHERS

BURTON R. LIFLAND, Chief Judge.

## BACKGROUND [1]

The controversy addressed here emanates from the decision of the United States Postal Service to enter the "used car" business. On September 19, 1983 (the "Acquisition Date"), pursuant to a stock purchase agreement dated July 24, 1983, Nakoma Corporation, an indirect subsidiary of LTV Corporation ("LTV"), acquired all of the capital stock of AM General Corporation ("AM General"), a wholly owned subsidiary of American Motors Corporation ("AMC"). On September 21, 1983, Nakoma Corporation transferred the stock of AM General to LTV Aerospace and Defense Company ("LTVAD"). Since September 21, 1983, AM General has been a wholly owned subsidiary of LTVAD.

On July 17, 1986 (the "Filing Date") and thereafter, LTV, LTVAD, AM General and their affiliates each filed a petition for reorganization under chapter 11 of the Bankruptcy Code (the "Code"), and have continued in the management and possession of their businesses and assets as debtors-in-possession pursuant to §§ 1107 and 1108 of the Code. No trustee or examiner has been appointed herein.

On October 6, 1989, LTV, LTVAD and AM General on behalf of themselves and the other debtors and debtors-in-possession (collectively, the "Debtors") filed their objection (the "Objection") to 32 claims (the "Claims") which allege, *inter alia*, that the damages to the claimants or the claimant's decedents (the "Claimants") resulted from an occurrence involving an AM General designed and manufactured motor vehicle known as the "Postal Dispatcher".[2] The

Claimants allege that AM General designed and sold a vehicle that has a resistance to rollover that is lower than typical passenger cars, a characteristic which they state is a product defect known as "rollover propensity". Each of the Claims is based upon the allegedly defective design of the Postal Dispatcher and a failure to warn of risks associated with the allegedly defective design.

The Claims sound in breach of warranty (i.e., contract law), negligence, strict tort liability, or other state law theories of recovery. In order to fully understand the question at issue, it is important to summarize the substance of the Objection. Debtors assert that AM General designed, manufactured and sold over 100,000 of these vehicles to the United States Post Office and its successor, the United States Postal Service (collectively, the "Post Office") to be employed as mail delivery vehicles, pursuant to contracts with the United States government. The Debtors further allege that AM General did not sell any Postal Dispatchers to any of the Claimants referred to herein. It is also alleged that LTV and LTVAD did not design, manufacture, or sell the Postal Dispatchers, and are not proper parties against whom claims involving the Postal Dispatchers can be asserted. Moreover, the Debtors state that LTV never held any ownership interest in AM General, and that LTVAD did not acquire any ownership interest prior to the production of some units of the last model of the Postal Dispatchers manufactured by AM General. Debtors assert that LTVAD as owner of the stock of AM General was not involved in the design, manufacture, or sale of any Postal Dispatchers.

Finally, the Debtors argue that as a result of recent case law recognizing the "government contractor defense," including the decision of the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), a government contractor cannot be

1. For additional background, see this court's related decision *In re Chateaugay Corp.*, 111 B.R. 67 (Bankr.S.D.N.Y.1990).

2. The LTV Bank Group has joined in the Debtors' request for the entry of an order disallowing these Claims.

held liable for defective design or failure to provide warnings, when the product was manufactured in accordance with reasonably precise specifications approved by the government. The Debtors assert that the Post Office and the United States Government approved reasonably precise specifications with regard to the Postal Dispatchers, which conformed to those specifications. The Debtors also contend that the manufacturers of the Postal Dispatchers did not know of any risks in the use of the vehicle that were not known to the Post Office and the United States Government.

On March 7, 1990, this Court held that it does have subject matter jurisdiction to determine the threshold issues of whether or not: (1) the LTV and LTVAD assertions in the Objection that the claims against them must be disallowed because they had no involvement whatsoever in the design, manufacture, or sale of Postal Dispatchers, are valid [3]; and (2) LTV, LTVAD, and AM General are entitled to immunity from civil liability under the government contractor defense enunciated by the Supreme Court in *Boyle, supra,* and, consequently, that as a matter of law, the Claims must be disallowed.[4] However, this Court does not have jurisdiction to liquidate or estimate these Claims for purposes of distribution, if, as a threshold matter, it is determined that the Claims are sustainable as a matter of law. *See In re Chateaugay Corp.,* 111 B.R. at 67.

In order to prevail on the Objection to claimants proofs of claim, Debtors have the burden of establishing in a summary judgment-type disposition that there are no genuine issues of material fact and that they are entitled to prevail as a matter of law with respect to the preclusive impact of the government contractor defense. This Court is not being called upon to determine damages based upon a finding of liability, but rather, simply that the Claims have no legal basis. The Debtors request summary judgment disallowing the claims to the extent inter alia that they allege that the Postal Dispatcher was defectively designed or that Debtors are liable for failure to warn of the risks associated with the design.

## ISSUE

Whether this Court should grant Debtors' motion for summary judgment on objection to allowance of claims involving postal dispatchers, on the basis of the "government contractor defense" as established in *Boyle.*

## DISCUSSION

### SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted to the moving party if the court determines that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10,

---

**3.** While the parties touched on this issue in their briefs, they chose not to argue it, focusing instead on the dispositive government contractor defense. Since the government contractor defense is indeed dispositive, this Court will not consider this issue.

**4.** The Seventh Circuit recently addressed a similar jurisdiction issue in *Pettibone Corp. v. Easley,* 935 F.2d 120 (7th Cir.1991). *Pettibone* involved different circumstances than those before this court. The claims involved in *Pettibone* appear to be purely personal injury actions while the claims herein are based on breach of warranty (i.e., contract law) as well as negligence and strict tort liability. In addition, since the *Pettibone* dispute occurred postconfirmation, there was no urgency to determine and liquidate the claims.

In any event, for the reasons set forth in its prior decision in this matter, *In re Chateaugay Corp.,* 111 B.R. 67, this court respectfully disagrees with *Pettibone's* conclusion that a bankruptcy court lacks jurisdiction to decide certain defenses that establish whether a personal injury claim against a bankrupt estate exists. *See Pettibone,* 935 F.2d at 123. Determination as to the existence or non-existence of a claim is a core matter, and it is essential to the bankruptcy process that this determination be made in an expedited manner.

91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c)). Although the movant initially bears the burden of showing that there are no genuine issues of material fact when a motion for summary judgment is made and supported by the movant, as in the instant case, Federal Rule 56(e) requires the adverse party to set forth specific facts showing that there is a genuine issue for trial. *See, Resource Developers, Inc. v. The Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134 (2d Cir.1991) *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (The party opposing a properly supported motion must set forth specific facts showing that there is a genuine issue for trial). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (That burden may be satisfied by pointing out the absence of evidence to support the non-movant's claims). If he does not do so, summary judgment, if appropriate, shall be entered against him. *See First National Bank of Arizona v. Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983).

The court is required to go beyond the mere pleadings of the parties and consider all of the admissible evidence set forth in the papers and all inferences reasonably deductible from such evidence to determine whether there is a genuine issue for trial. *Schwabenbauer v. Board of Education,* 667 F.2d 305, 313 (2d Cir.1981). Evidence on collateral issues that do not pertain to the basis upon which summary judgment is sought cannot defeat the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The issue must also be genuine. Accordingly, the nonmoving party may not merely "show that there is some metaphysical doubt as to the material facts." *Id.* Evidence which "is merely colorable ... or is not significantly probative" will not suffice. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Similarly, the nonmoving party cannot evade this burden with "vague assertions that further discovery would develop genuine issues of material fact." *United States v. Bob Stofer Oldsmobile–Cadillac, Inc.,* 766 F.2d 1147, 1152 (7th Cir.1985).

Local Bankruptcy Rule 13(h), in pertinent part, provides:

> On any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion. The party opposing the motion for summary judgment is also required to submit a separate short and concise statement of material facts in which it contends there exists a genuine issue to be tried.

Here, the Claimants' by failing to respond to the Debtor's Local Rule 13 statement, have presented no genuine issue necessitating a trial. Additionally, Local Rule 13(h) provides that:

> [a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

In any event, Claimants have failed completely to produce any evidence to contradict any of the facts relied upon by the Debtors. Instead, Claimants offer vague and conclusory testimony from their purported experts, John Noettl and Norris Shoemaker, and deposition excerpts from Robert St. Francis, all of which address only non-material issues and, therefore, fail to raise a genuine issue precluding the entry of summary judgment. As Judge Weinstein has noted:

> the edicts of Rule 56(e) ... do not allow mere conclusory allegations that a factual dispute exists to defeat a motion for summary judgment. This general prohibition extends to the use of conclusory allegations by experts.

*In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. 1223, 1259 (E.D.N.Y.1985); *See*

*also United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir.1981). Therefore, summary judgment is appropriate here since there are no genuine issues of material facts in dispute to bar a determination solely as a matter of law.

## GOVERNMENT CONTRACTOR DEFENSE

In *Boyle, supra,* the United States Supreme Court found that as a matter of federal common law the "government contractor defense" applies to product liability actions against contractors for the federal government. *Boyle* held that the government contractor defense applies to both negligence and strict liability actions as well as to other state law tort actions. *See also Smith v. Xerox Corp.* 866 F.2d 135, 137 (5th Cir.1989). The Court reasoned that imposing civil liability on government contractors affects not only the rights of private parties but also the interests of the U.S. government. If the contractor is exposed to liability, the Court said, the contractor could refuse to manufacture the government design or raise the product price. Thus, state imposition of tort liability on government contractors potentially affects federal interests and could obstruct the federal government's exercise of discretionary powers, usually immune from civil liability. *Boyle,* 487 U.S. at 513, 108 S.Ct. at 2518–19.

*Boyle* held that a government contractor cannot be held liable for design defects in products made for the government if the contractor meets several criteria:

1) the U.S. government approved reasonably precise specifications;

2) the equipment conformed to those specifications; and

3) the supplier warned the U.S. government about dangers in the use of equipment known to the supplier but not to the U.S.

*Id.* at 512, 108 S.Ct. at 2518.

In the instant case, Post Office Engineers developed "POD Specifications" which were provided to all parties expressing interest in bidding on providing Dispatchers to the government. These POD Specifications refer to the *initial* government-issued specifications which accompanied each request for technical proposal, bid solicitation, and contract. After selecting the winning prototype of the Dispatcher over competing models by Ford and International Harvester, the government engaged in further discussions with the manufacturer to refine the final design.

The manufacturer and the government then engaged in an interactive process of final design, testing and modification leading to the promulgation of Final Specifications (the "Specifications") for the Dispatcher. The Specifications were developed by the manufacturer at the conclusion of the design process and approved by the government. The government inspected, tested, and approved the pilot model embodying the Specifications for the vehicle. This two-step specification process allowed for the design of the new postal vehicle to evolve as a result of continued input from both the manufacturer and the government, with the final design decisions being explicitly approved by the government. Only then did the government allow production of the Postal Dispatchers.

No deviation from the Specifications was permitted without government approval and each vehicle was accepted as conforming to the Specifications. As a result of evaluations of the Dispatcher commissioned by the government, and the Post Office's practical field experience with the Dispatcher, including investigations and record-keeping of Dispatcher accidents, the record before this court shows that in all essentials the government knew as much as, if not more than, the manufacturer regarding the risks associated with the use of the Dispatcher. Under eleven separate contracts over a period of fifteen years, the Post Office purchased more than 144,000 of the Dispatchers.

The Claimants' arguments pertaining to meeting the three requirements set by the *Boyle* Court, 487 U.S. at 512, 108 S.Ct. at 2518 for the applicability of the government contractor defense fall into two classes. First, they focus on the supposed discretion permitted the manufactur-

er under the initial, or starting-point, POD Specifications. The Claimants ignore the fact that the government approved the final, or ending-point, specifications for the Dispatcher. These final Specifications were very precise, and all that is required for applicability of the government contractor defense is government *approval* of reasonably precise final product specifications, not government *development* of the specifications from start to finish. *Id.* at 512, 108 S.Ct. at 2518. The government contractor defense established in *Boyle* anticipates that government procurement will involve industry input into the design of government equipment, and it assures that the government can obtain such industry expertise at the most economical price by insulating manufacturers from liability for manufacturer's designs that are approved by the government.

█ A corollary of Claimants' first argument against the applicability of the government contractor defense is that the defense does not apply because the track width and the center of gravity were not separately and specifically promulgated as standard in the POD Specifications. Once again, it must be emphasized that the government approved the Final Specifications for the Dispatcher, and in so doing, approved *all* design features of the Dispatcher including the track width and center of gravity.

█ The second line of Claimant's arguments contend that the fuel system on the Dispatcher was a "stock" item and, therefore, *Boyle* does not apply. Here, the government entered into a contract for the design and manufacture of an entire vehicle and not for the design and manufacture of a fuel system. The fact that some of the Dispatchers' components were procured from parts suppliers and did not have to be designed and manufactured from scratch does not make the vehicle a stock product. A manufacturer need not reinvent all components of a custom designed vehicle in order for the government contractor defense to apply. In addition, government approval of each component part is not required so long as the govern-

ment approves the overall design of the product taking into account its components. In any event, the evidence indicates that the government did specifically evaluate the fuel system. The POD specifications indicated the capacity of the fuel tank. The fuel system design, furthermore, was changed at the government's request following the inspection of the DJ–5A prototype.

## DERIVATIVE IMMUNITY

█ In the interests of furthering free exercise of discretion by government officials, the Federal Tort Claims Act exempts from its waiver of sovereign immunity

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

28 U.S.C.A. § 2680(a) (West 1965). The selection of the appropriate design for military equipment, the *Boyle* majority noted, is a discretionary function within the meaning of the provision since it involves a judgment as to "the balancing of many technical, military and even social considerations...." *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2517. The Court further found that permitting "second guessing" of these discretionary judgments would create the same result that the FTCA exemption seeks to avoid. The Court said that it makes

little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

*Id.* at 512, 108 S.Ct. at 2518.

█ In this regard, many courts have recognized that Post Office decisions in regard to the purchase, design and resale of Postal Dispatchers were discretionary acts, exempt from liability under section 2680(a) of the Federal Tort Claims Act. *See Jurzec v. American Motors Corp.*, 856 F.2d 1116, 1120 (8th Cir.1988); *Myslakowski v. United States*, 806 F.2d 94, 98–99

(6th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987); *Ford v. Am. Motors Corp.,* 770 F.2d 465, 468 (5th Cir.1985); *Louviere v. AM Gen. Corp.,* 620 F.Supp. 6 (W.D.La.1985); *Shirey v. United States,* 582 F.Supp. 1251 (D.S.C.1984). Therefore, it seems clear to this Court that the Dispatcher was procured in a manner that would bring it under the government contractor defense, if it is otherwise applicable.

■ The Claimants argue that the Debtors are incorrect in their assertion that the government contractor defense applies to actions for damages resulting from the use of non-military equipment. The majority did not specifically address this issue in *Boyle,* but Justice Brennan (joined by Justices Marshall and Blackmun), in his dissent, made clear that his reading of the Court's majority opinion extended the government contractor defense "to any made to order gadget that the Federal Government might purchase after previewing plans—from NASA's Challenger space shuttle to the Postal Service's old mail cars." *Boyle,* 487 U.S. at 516, 108 S.Ct. at 2520. Since the majority chose neither to affirm nor deny this conclusion, this court must decide whether the majority intended to limit its holding to military contractors.

In *Boyle,* the Court adopted the same three-part test for the government contractor defense that the Ninth Circuit used in *McKay v. Rockwell Int'l Corp.* ("*McKay*"), 704 F.2d 444 (9th Cir.1983). At first blush, *McKay* appeared to confine the government contractor defense to military equipment procured by the government. The *McKay* case, like *Boyle,* arose from an action for injuries suffered in the course of military duties, as a result of defective equipment approved by the government. The case focused on application of the government contractor defense to military equipment design defects. The case law and policy the court used in its analysis also revolved around the military. *McKay,* 704 F.2d at 448–450. However, the court acknowledged at the outset that the defense originated in non-military design defect cases, which protected govern-

ment contractors from liability for acts they performed while complying with government specifications. *Id.* at 448, *citing to Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940) (Government construction contractor not liable for land erosion caused by government approved work); *Myers v. United States,* 323 F.2d 580, 583 (9th cir. 1963) (government highway contractor, working according to government specifications, not liable for waste and trespass of private land); *Dolphin Gardens, Inc. v. United States,* 243 F.Supp. 824, 827 (D.Conn.1965) (government contractor, failing to prevent escaping fumes from river soil deposited on vacant lots, not liable for damaging private property).

After painting a non-military backdrop for the government contractor defense with the above cited cases, only then did the *McKay* court expand its analysis to include military contracts. "While the government contractor defense covered at first only construction projects it has recently been applied by several courts to military equipment design defect cases." *McKay,* 704 F.2d at 448. The *McKay* court clearly did not confine the government contractor defense to the military but used the military in this instance to apply the law to the facts at hand. Thus, it is unlikely that the *Boyle* Court, in adopting the *McKay* government contractor defense almost verbatim, intended to confine the defense to the military.

The *Boyle* Court also rejected the McKay court's reliance on the Feres–Stencel doctrine, further evidence that the Court in *Boyle* did not intend to confine the contractor defense to the military. The Feres/Stencel doctrine protects the United States government from claims by servicemen, or third party claims for contribution or indemnity for injuries sustained by service personnel incident to military service. The Feres/Stencel courts held that such injuries are not covered by the Federal Tort Claims Act. *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950); *Stencel Aero Eng'g. Corp. v. United States,* 431 U.S. 666, 673–74, 97 S.Ct. 2054, 2058–59, 52 L.Ed.2d 665 (1977).

The *Boyle* Court said the Feres/Stencel doctrine, the first and only prong of the *McKay* test directly tied to the military, is too narrow to be applied to the government contractor defense, because it does not include suits by civilians who are injured by the military.

Rather than relying on the Feres/Stencel doctrine, *Boyle* turned to the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680, which applies to both military and non-military government agencies. The discretionary function exemption is broadly designed to prevent "judicial second guessing of legislative and administrative decisions grounded in social, economic and political policy." *Jurzec*, 856 F.2d at 1118. *Boyle* said the need for the discretionary function exemption arises when there is a significant conflict between state and federal law or policy, in which case federal common law must override state law. But *Boyle* did not confine the discretionary function exemption to the military. Instead, the Court considers the military as one of several areas for which the government should be permitted to use its discretion and for which government contractors should be protected. The Court said "we think that the selection for the appropriate design for military equipment to be used by our armed forces is assumed *a discretionary function* within the meaning of this provision." *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2517. Further, as previously stated, several courts have held that decisions made by the post office in connections with the design, purchase and resale of Postal dispatchers fall under the discretionary function exemption. *See, Supra* p. 821–22.

Despite what appears to be the clear intent of cases like *Boyle* and *McKay*, *Nielsen v. George Diamond Vogel Paint Co.* (*"Nielsen"*), 892 F.2d 1450 (9th Cir.1990) and several other cases following *Boyle*, have found that the government contractor defense is exclusively for the military. In *Nielsen*, the court arrived at this conclusion out of fear that the government contractor defense will not be adequately contained by the courts rather than through sound legal reasoning or reliance on case law. *Id.* at 1453. With virtually no analysis, several other cases have also concluded that the government contractor defense does not apply beyond the military. See *In re Haw. Fed. Asbestos Cases*, 715 F.Supp. 298, 300 (D.Haw.1988); *Weitzman v. Eagle–Picher Indus. (In re New York City Asbestos Litigation)*, 144 Misc.2d 42, 542 N.Y.S.2d 118, 121 (Sup.Ct.N.Y. County 1989); *Reynolds v. Penn Metal Fabricators, Inc.*, 146 Misc.2d 414, 550 N.Y.S.2d 811 (Sup.Ct. Queens Co.1990).

In *Nielsen* the court noted that
> [s]everal commentators have suggested, some with considerable alarm, that all United States Government contracts may now automatically invoke the government contractor defense.

and that the
> Feres doctrine ... if extended to all government contracts would be too broad in that it would immunize the contracts from the results of their own negligence.

*Nielsen*, 892 F.2d at 1453. But the *Nielsen* court acknowledged that the "underlying premise in *Boyle* applies to all government contracts and is not limited to the military context." *Id.* at 1454.

The Second Circuit has thoroughly reviewed *Boyle* in a case involving a manufacturer that supplied asbestos cement to a Naval yard, *Grispo v. Eagle–Picher Indus., Inc.*, 897 F.2d 626 (2d Cir.1990). The Claimants assert that even though *Grispo* only addressed the availability of the government contractor defense to a military contractor, the case implicitly holds that the defense is limited to military contractors. In fact, the Circuit Court does repeatedly refer to this defense as the "military contractor defense." This court, however, finds no indication in *Grispo* that the Court of Appeals even considered the application of the government contractor defense to a non-military contractor. The Court of Appeals simply had no reason to decide the issue of whether the government contractor defense applied to non-military contractors. It only reaffirmed what was clear after *Boyle;* the defense does apply

to military contractors. This is the only finding that was necessary to the Second Circuit's decision.

Finally, the two factors relied upon by the Court in *Boyle* to find that state law should be displaced by federal law—the discretionary function exemption and the *McKay* government contractor defense—are not directly tied to the military. The Court noted that all government procurement—not just military procurement—involves a uniquely federal interest. *Boyle*, 487 U.S. at 507, 108 S.Ct. at 2515. Almost all analogous decisions relied upon by the Court, where an area of uniquely federal concern was implicated, did not involve the military. *See, Id.* at 505–511, 108 S.Ct. at 2514–18.[5] Further, the government contractor defense has also been applied to other situations outside the military. *See Boruski v. United States*, 803 F.2d 1421, 1430 (7th Cir.1986) (applied to the Swine Flu Vaccine) and *Burgess v. Colo. Serum Co.*, 772 F.2d 844, 846 (11th Cir.1985) (observing that "[b]oth the history of the [government contractor] defense and its general rationale" lead to the "conclusion that it would be illogical to limit the availability of the defense solely to 'military' contractors.")

In light of the above analysis, this Court cannot reject Justice Brennan's reading of the majority opinion in *Boyle*, and accepts the Debtors' contention that the Supreme Court's holding allows the government contractor defense to be applied to actions for damages resulting from the use of non-military equipment.

## CONCLUSION

For the foregoing reasons, the government contractor defense shields the Debtors from liability for claims arising from the allegedly defective vehicles sold to Claimants. The Debtors motion for summary judgment is granted.

The parties are instructed to submit an order consistent with this memorandum decision.

**5.** One of those cases specifically concerned the activities of the Postmaster General. *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896). The other cases cited by the Supreme Court included the following: *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) (Suit to quiet title in mineral reservations); *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (activities of the District of Columbia office of Rent Stabilization); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947) (breach of contract with the Federal Surplus Commodities Corp.). *National Metro. Bank v. United States*, 323 U.S. 454, 456, 65 S.Ct. 354, 355, 89 L.Ed. 383 (1945) (forged check drawn on the U.S. Treasury); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).