# MARY CARLEY, Appellant
## v.
# WHEELED COACH

[991 F.2d 1117]

No. 92-7208

United States Court of Appeals
for the Third Circuit

April 16, 1993

THOMAS ALKON (Argued) (ALKON & RHEA), Christiansted, St. Croix, *for appellant*

R. ERIC MOORE (Argued), Christiansted, St. Croix, *for appellee*

BEFORE: BECKER, COWEN and ROTH, *Circuit Judges*

## OPINION OF THE COURT

COWEN, *Circuit Judge*

Plaintiff Mary Carley appeals the grant of summary judgment dismissing her claim for personal injuries caused by an alleged design defect in an ambulance manufactured by defendant Wheeled Coach Industries, Inc. ("Wheeled Coach"). The issue in this appeal is whether the manufacturer of a nonmilitary product may assert the government contractor defense, recognized in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510 (1988), in a strict products liability action based on a design defect. We conclude that the government contractor defense is available to nonmilitary contractors under federal common law. However, because Wheeled Coach failed to prove that it warned the United States government of dangers in its ambulance known to Wheeled Coach but not to the government, we will reverse the grant of summary judgment and remand for trial.

I.

Plaintiff Mary Carley is an emergency medical technician employed by the Virgin Islands Department of Health at St. Croix Hospital. On September 2, 1988, she was on duty and riding as a passenger in a 1987 Ford E-350 Type II 6.9 liter diesel-powered ambulance manufactured by Wheeled Coach, a Florida corporation. While the ambulance was en route to the scene of an emergency, an automobile failed to properly yield the right-of-way. The ambulance made an evasive maneuver and flipped over. Carley suffered injuries to her knee and back, including a herniated disk. A police officer who witnessed the accident reported that the ambulance was driven in a reasonable and safe manner for an emergency situation.

The ambulance was manufactured by Wheeled Coach pursuant to a contract (No. GS-OOF-89100) with the United States General Services Administration ("GSA"). The GSA solicited bids for the manufacture of the ambulance in compliance with the Federal

Specification for Ambulance KKK-A-1822B, dated June 1, 1985, which was incorporated into the contract. After Wheeled Coach completed the ambulance, a GSA quality assurance inspector examined it, concluded that it complied with contract specifications, and released it for shipment.

On April 4, 1989, Carley filed suit against Wheeled Coach in the District Court of the Virgin Islands (Civ. No. 89-94), alleging strict products liability and breach of warranty arising from the manufacture and sale of an ambulance with a design defect. Carley claimed that the ambulance was unreasonably prone to turn over during intended use because of an excessively high center of gravity. One of the affirmative defenses raised by Wheeled Coach was the government contractor defense. Wheeled Coach claimed that it was immune from liability because it built the ambulance in the performance of its obligations under a contract with the United States government.

Wheeled Coach moved for summary judgment and the district court granted the motion. The court concluded that either federal common law or Virgin Islands law governed the dispute, and that under either body of law, the government contractor defense is available to nonmilitary contractors and was established by Wheeled Coach as a matter of law. Carley moved for reconsideration on the grounds that Florida law applies, and Florida law does not recognize a government contractor defense for nonmilitary contractors. See Dorse v. Armstrong World Indus., Inc., 513 So. 2d 1265, 1269 (Fla. 1987). The district court denied her motion, concluding that even if this suit were governed by state law instead of federal common law, Virgin Islands law would apply and render Wheeled Coach immune. Carley appealed.

The district court had jurisdiction under 28 U.S.C. § 1332(a)(1) (1988), and we have jurisdiction under 28 U.S.C. § 1291 (1988). Our review of a grant of summary judgment is plenary. Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992). We apply the same test as the district court under Fed. R. Civ. P. 56(c), asking whether there remains a genuine issue of material fact, and if not, whether the moving party is entitled to judgment as a matter of law. Id. We view all facts and all inferences therefrom in the light most favorable to the nonmoving party, in this case the plaintiff Carley. Id.

## II.

■■ In Boyle v. United Technologies Corp., 487 U.S. 500, 507-08, 108 S. Ct. 2510, 2515-16 (1988), the Supreme Court held that before state tort law is applied in a products liability action involving the government contractor defense, it must first be determined whether state law is in significant conflict with the federal interests associated with federal procurement contracts. The Court announced a three-prong test for determining when state tort law is displaced by federal common law in a suit against a military contractor:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Id. at 512, 108 S. Ct. at 2518; Maguire v. Hughes Aircraft Corp., 912 F.2d 67, 70 (3d Cir. 1990). If all three prongs are met, the government contractor defense is established and the defendant manufacturer is immune from liability under state law.

■ In Boyle, the Court specifically applied the government contractor defense in the context of a military procurement contract. The defendant manufacturer built a military helicopter with an allegedly defective escape hatch in compliance with specifications provided by the United States. 487 U.S. at 502-03, 108 S. Ct. at 2513. The Court, however, did not address whether the government contractor defense is also available to manufacturers of nonmilitary products, an issue which has generated a significant split in author-

ity.[1] We conclude that the reasoning of Boyle applies to both military and nonmilitary contractors.[2]

The Court initially observed that a few areas involving uniquely federal interests are so committed to federal control by the Constitution and laws of the United States that state law is preempted and replaced, where necessary, by federal common law. Id. at 504, 108 S. Ct. at 2514. The Court identified two areas of unique federal concern: the obligations to and rights of the United States under its contracts, id. at 504-05, 108 S. Ct. at 2514 (citing United States v. Little Lake Misere Land Co., 412 U.S. 580, 592-94, 93 S. Ct. 2389,

---

[1] This split is evident in cases both before and after the landmark decision in Boyle. The following opinions have held that the government contractor defense is available to all manufacturers: Boruski v. United States, 803 F.2d 1421, 1430 (7th Cir. 1986); Burgess v. Colorado Serum Co., 772 F.2d 844, 846 (11th Cir. 1985); Johnson v. Grumman Corp., 806 F. Supp. 212, 217 (W.D. Wis. 1992); Price v. Tempo, Inc., 603 F. Supp. 1359, 1361-62 n.3 (E.D. Pa. 1985); In re Chateaugay Corp., 132 B.R. 818, 823-27 (Bankr. S.D.N.Y. 1991), rev'd, 146 B.R. 339 (S.D.N.Y. 1992); Vermeulen v. Superior Court of Alameda County. 251 Cal. Rptr. 805, 809-10 (Cal. Ct. App. 1988); McDermott v. TENDUN Constructors, 511 A.2d 690, 696 (N.J. Super. Ct. App. Div.), cert. denied, 526 A.2d 134 (N.J. 1986).

The following opinions have held that the government contractor defense is only available to manufacturers of military products: In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 810-12 (9th Cir. 1992); Nielsen v. George Diamond Vogel Paint Co., 892 F.2d 1450, 1452-55 (9th Cir. 1990); In re Chateaugay Corp., 146 B.R. 339, 348-51 (S.D.N.Y. 1992); Johnston v. United States, 568 F. Supp. 351, 356-58 (D. Kan. 1983); Jenkins v. Whittaker Corp., 551 F. Supp. 110, 114 (D. Haw. 1982); Pietz v. Orthopedic Equip. Co., 562 So. 2d 152, 155 (Ala. 1989). cert. denied, — U.S.—, 111 S. Ct. 75 (1990); Dorse, 513 So. 2d at 1269; Reynolds v. Penn Metal Fabricators, Inc., 550 N.Y. S. 2d 811, 812 (N.Y. Sup. Ct. 1990); In re New York City Asbestos Litig., 542 N.Y.S.2d. 118, 121 (N.Y. Sup. Ct. 1989).

[2] The dissent accuses us of taking "a giant leap, exponentially expanding the reach of Boyle." Dissent Typescript at 14. The dissent also cites to Justice Brennan's "forcefully" argued dissent in Boyle to support its argument against judicial exercise of federal common law, even in this limited context. However, Judge Becker's dissent omits Justice Brennan's further observation that the Boyle majority opinion could be applied in the precise manner that we have done here:

[F]or the Court's newly discovered Government contractor defense is breathtakingly sweeping. It applies not only to military equipment like the CH-53D helicopter, but (so far as I can tell) to any made-to-order gadget that the Federal Government might purchase after previewing plans—from NASA's Challenger space shuttle to the Postal Service's old mail cars.

Boyle, 487 U.S. at 516, 108 S. Ct. at 2520 (Brennan, J., dissenting).

2396-97 (1973)), and the civil liability of federal officials for actions taken in the course of their duty, id. at 505, 108 S. Ct. at 2514-15 (citing Westfall v. Erwin, 484 U.S. 292, 295, 108 S. Ct. 580, 583 (1988)). Though neither of these two lines of precedent involved a federal interest unique to the military, they provided the basis for judicial recognition of the government contractor defense. See id. at 504-07, 108 S. Ct. at 2414-15.

The Court also relied heavily on Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S. Ct. 413 (1940) (cited in Boyle, 487 U.S. at 506, 108 S. Ct. at 2515), in which a construction company damaged the property of riparian landowners while constructing dikes pursuant to a contract with the United States government. The construction project was authorized by an act of Congress and supervised by federal officials. The Court held that the contractor could not be held liable for damages under state law, reasoning that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 20-21, 60 S. Ct. at 414.

■■ This same rationale, which is equally applicable to military and nonmilitary contractors, underlies the modern government contractor defense. A private contractor who is compelled by a contract to perform an obligation for the United States should, in some circumstances, share the sovereign immunity of the United States. Though the contractor in Yearsley was an agent of the United States, id., while the contractor in Boyle and the present case were independent contractors, this distinction was not significant to the Court in Boyle. See 487 U.S. at 505-06, 108 S. Ct. at 2515. The Court regarded the federal interest in a performance contract in Yearsley as being essentially the same as the federal interests in procurement contracts. See id. "[T]he liability of independent contractors performing work for the Federal Government . . . is an area of uniquely federal interest." Id. at 505 n.1, 108 S. Ct. at 2515 n.1. The imposition of liability on an independent contractor who enters into a procurement contract with the United States directly implicates the significant federal interest in the completion of the government's work. See id. at 505, 108 S. Ct. at 2515. That significant federal interest exists regardless of whether the procurement contract is military or nonmilitary in nature.

The Court in Boyle acknowledged that there is a unique federal interest in all contracts in which the government procures equipment, not just those with military suppliers. See id. at 506-07, 108 S. Ct. at 2515-16. The Court described how tort actions against government contractors can harm the government: "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." Id. at 507, 108 S. Ct. at 2515-16. Thus, without the government contractor defense, it would be more difficult and costly for the government to acquire products. The government would suffer this economic harm regardless of whether it procured a product for military or civilian use.

The strongest reason for making the government contractor defense available to all contractors is the Court's express rejection of the Feres doctrine as the basis of the defense, and its reliance instead on the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a) (1988). See Boyle, 487 U.S. at 510-11, 108 S. Ct. at 2517-18. The Feres doctrine renders the United States immune from tort liability for injuries to servicemen arising out of or in the course of activity incident to military service. Feres v. United States, 340 U.S. 135, 146, 71 S. Ct. 153, 159 (1950); see also Stencel Aero Eng'g Corp. v. United States, 431 U.S. 666, 673-74, 97 S. Ct. 2054, 2059 (1977) (United States not liable for indemnification of government contractor that paid damages to serviceman injured during military service). Prior to Boyle, courts generally considered Feres to be the source of the government contractor defense. See, e.g., Koutsoubos v. Boeing Vertol, Div. of Boeing Co., 755 F.2d 352, 354 (3d Cir.), cert. denied, 474 U.S. 821, 106 S. Ct. 72 (1985); McKay v. Rockwell Int'l Corp., 704 F.2d 444, 449 (9th Cir. 1983), cert. denied, 464 U.S. 1043, 104 S. Ct. 711 (1984). In Boyle, however, the Court explicitly rejected Feres as the basis for the defense, reasoning that the Feres doctrine is too broad because it would render contractors immune for injuries caused by any standard equipment purchased by the government, and too narrow because it would permit state regulation of military decisions through tort actions brought by civilians. Boyle, 487 U.S. at 510-11, 108 S. Ct. at 2517-18. Instead of relying on Feres, which applies only to torts arising out of military service, the Court instead relied on

317

the discretionary function exception of the FTCA, which applies to government action in both military and nonmilitary matters.

The FTCA authorizes damages suits against the United States for injuries caused by the tortious conduct of any federal employee acting within the scope of his employment, to the same extent that a private person would be liable under state law. 28 U.S.C. § 1346(b) (1988). This waiver of sovereign immunity, however, does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a). In Boyle, the Court stated that the discretionary function exception of the FTCA suggests the outlines of a "significant conflict" between federal interests and state law in the procurement context which would justify displacement of state law. 487 U.S. at 511, 108 S. Ct. at 2518. The Court concluded that the selection of military equipment designs by the armed forces is a discretionary function within the meaning of section 2680(a), for the following reasons:

> [Selection of military equipment designs] often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.

Id. at 511-12, 108 S. Ct. at 2518 (citation omitted). Though government contracts for nonmilitary products do not involve considerations of combat effectiveness, all of the other policy reasons cited by the Court in support of the government contractor defense are

equally applicable to military and nonmilitary procurements.[3] To determine the design of a nonmilitary product, the government sometimes may engage in complex engineering analysis and may trade off product safety in favor of other technical, economic, or social considerations. If nonmilitary contractors were not protected by a government contractor defense, their increased financial bur-

---

[3] The Court in Boyle did not define precisely what considerations of "greater combat effectiveness" are implicated by the government's decision to design the CH-53D helicopter's escape hatch to open outward rather than inward. It merely listed combat effectiveness as one of several policy considerations. which combine to constitute the government's exercise of a "discretionary function" that triggers the government contractor defense. Notwithstanding this omission, Judge Becker's dissent makes a leap and equates the undefined consideration of "combat effectiveness" with "national security" concerns, Dissent Typescript at 24, and with "highly sensitive military decisions." id. at 28 (emphasis in original). The dissent insists thereby that Boyle soundly establishes that the government contractor defense is "premised on concerns unique to the military." Id. at 22; see also id. at 28 ("[T]he concern in Boyle about passing liability costs onto the government is meaningful because of its relation to the acute federal interest in avoiding judicial interference with the design of military equipment.").

Quite to the contrary. Boyle contains language and examples which illustrate that the concern about combat effectiveness is not paramount to, but rather is on an equal footing with, the other policy concerns mentioned, such as engineering analysis, technical, military, and social considerations. and passed-on costs of judgments against contractors. When present, these factors combine to constitute a "significant conflict" in the analysis of the government contractor defense's application and argue in favor of applying it to manufacturers of nonmilitary products. The Court stated that "it is plain that the Federal Government's interest in the procurement of equipment [not strictly military equipment] is implicated by suits such as the present one." Boyle, 487 U.S. at 506, 108 S. Ct. at 2515.

Secondly, in searching for the limiting principle to identify those situations where a "significant conflict" exists between an identifiable federal interest and the operation of state law, the Court used an illustration involving an obviously nonmilitary piece of equipment:

If, for example. the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary.

Id. at 509, 108 S. Ct. at 2517. Therefore, we simply disagree with Judge Becker's assertion that the concerns articulated in Boyle in support of the government contractor defense are somehow "unique" to military equipment procurement.

dens would pass through to the government. Also, allowing state tort actions against nonmilitary contractors who have complied with government contracts would, in effect, empower state authorities to "second-guess" federal policy decisions respecting the design of products for use in civilian projects. See United States v. S.A. Empresa de Viacao Aerea Rio Grandese (Varig Airlines), 467 U.S. 797, 814, 104 S. Ct. 2755, 2765 (1984) (The purpose of the discretionary function exception is to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.").

■ After Boyle, the discretionary function exception to the FTCA indicates the scope of the government contractor defense. Id. at 511, 108 S. Ct. at 2518. We therefore must consider whether the government performs a discretionary function when, with knowledge of safety risks, it determines the design of a nonmilitary product and procures it through a contract. If such action falls within the exception, then the government is immune from tort liability, and the supplier should be able to raise the government contractor defense.

In Dalehite v. United States, 346 U.S. 15, 73 S. Ct. 956 (1953), a ship loaded with ammonium nitrate fertilizer exploded in a Texas harbor. The fertilizer was produced by private contractors at government plants according to government specifications. The Court held that the government was not liable for injuries caused by the explosion because it performed a discretionary function under 28 U.S.C. § 2680(a) when it planned the fertilizer shipment program, determined the ingredients of the fertilizer, and determined the methods for coating, storing, and shipping it. See id. at 37-42, 73 S. Ct. at 969-71. The Court stated that the discretionary function exception "includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." Id. at 35-36, 73 S. Ct. at 968 (footnote omitted).

Other courts have held that when the government determines the design of a roadway or bridge, it performs a discretionary function under section 2680(a) and is immune from tort liability for injuries caused by alleged defects in design. See Miller v. United States, 710 F.2d 656, 666-67 (10th Cir.), cert. denied, 464 U.S. 939,

104 S. Ct. 352 (1983); Wright v. United States, 568 F.2d 153, 158-59 (10th Cir. 1977), cert. denied, 439 U.S. 824, 99 S. Ct. 94 (1978); Schmitz v. United States, 796 F. Supp. 263, 268 (W.D. Mich. 1992); Baum v. United States, 765 F. Supp. 268, 275-76 (D. Md. 1991). The government also performs a discretionary function under section 2680(a) when it makes a decision regarding the design, purchase, and resale of Post Office vehicles and therefore is not liable for injuries caused by defects in those vehicles. See Jurzec v. American Motors Corp., 856 F.2d 1116, 1118-20 (8th Cir. 1988) (government's sale of postal jeep with cursory warning of its rollover propensity was a discretionary act); Myslakowski v. United States, 806 F.2d 94, 99 (6th Cir. 1986) (government's sale of postal jeep with no warning of its rollover propensity was a discretionary act), cert. denied, 480 U.S. 948, 107 S. Ct. 1608 (1987); Ford v. American Motors Corp., 770 F.2d 465, 467 (5th Cir. 1985) (same); Shirey v. United States, 582 F. Supp. 1251, 1262 (D.S.C. 1984) (same). "[B]oth the evaluation of actual or suspected hazards, and the decision to proceed in a particular manner in light of those hazards, are protected discretionary acts, not subject to tort claims in the district court." Ford, 770 F.2d at 467. The Post Office's discretionary decision to order or sell postal vehicles with particular design hazards is analogous to the GSA's procurement of ambulances (or other nonmilitary products) with potentially dangerous designs. Both fall within the scope of section 2680(a).

The Court in Boyle premised the government contractor defense on the discretionary function exception of the FTCA, and we believe that the government performs a discretionary function when it procures a nonmilitary product with an awareness of its dangers. We therefore conclude that the government contractor defense is available to nonmilitary contractors.[4]

Our holding is consistent with Burgess v. Colorado Serum Co., 772 F.2d 844, 846 (11th Cir. 1985), and Boruski v. United States, 803 F.2d 1421, 1430 (7th Cir. 1986). In Burgess, the court held that the

---

[4] Several scholars have reached the same conclusion. See R. Cass & C. Gillette, The Government Contractor Defense: Contractual Allocation of Public Risk, 77 Va. L. Rev. 257, 259 (1991); M. Green & R. Matasar, The Supreme Court and the Products Liability Crisis: Lessons from Boyle's Government Contractor Defense, 63 S. Cal. L. Rev. 637, 685, 688-91 (190); C. Lofton, Note, Expansion of the Government Contractor Defense; Applying Boyle to Vaccine Manufacturers, 70 Tex. L. Rev. 1261, 1280-82 (1992).

government contractor defense was not limited to military products and therefore could be raised by the manufacturer of a brucellosis vaccine. After observing that the defense originated in cases immunizing private contractors from liability arising out of public work projects, 772 F.2d at 846 (citing Yearsley, 309 U.S. at 18, 60 S. Ct. at 413; Myers v. United States, 323 F.2d 580 (9th Cir. 1963)), the court concluded that the rationale of the defense is the extension of sovereign immunity, and that in circumstances where the government would not be liable, private actors acting pursuant to government directives should not be liable either. Id. Thus, the court reasoned that it would be illogical to limit the defense to military contractors, because any contractor who acts in the sovereign's stead and meets the three-prong test should not be denied the extension of sovereign immunity that is the government contractor defense. Id.; accord Boruski, 803 F.2d at 1430 (manufacturer of a swine flu vaccine could raise government contractor defense) (citing Burgess, 772 F.2d at 846).

The courts in Burgess and Boruski concluded that the underlying rationale of the government contractor defense—the extension of the government's sovereign immunity to private actors who perform their obligations to the government—is not limited to military procurement. That reasoning is still valid after Boyle, which states that the sovereign immunity of the government as codified in 28 U.S.C. § 2680(a) provides the rationale for the government contractor defense. See 487 U.S. at 511-13, 108 S. Ct. at 2518-19.[5]

Our holding conflicts with the law of the Ninth Circuit, which limits the government contractor defense to military contractors. See In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 810-12 (9th Cir. 1992); Nielsen v. George Diamond Vogel Paint Co., 892 F.2d 1450, 1452-55 (9th Cir. 1990). In Nielsen, the court focused on language in Boyle stating that the unique federal interest inherent in all procurement contracts is a necessary, but not sufficient, condi-

---

[5] As Judge Becker observes in his dissent, Dissent Typescript at 25 n.2, Burgess and Boruski applied the government contractor defense under Alabama and Illinois law respectively. rather than under federal common law. However, the courts' decision to apply the defense to nonmilitary contractors was not based on analysis of state law. Relying on federal authorities, the courts concluded that the sovereign immunity of the government should extend to private contractors who perform their obligations to the government. See Burgess, 772 F.2d at 846; Boruski, 803 F.2d at 1430. This reasoning is consistent with Boyle.

tion for displacement of state law. 892 F.2d at 1454 (citing Boyle, 487 U.S. at 507, 108 S. Ct. at 2516). The court reasoned that the government contractor defense should be limited to military procurements because Boyle focused its analysis on military concerns, id. at 1454, and because applying state law to civilian procurements would not cause a significant enough conflict with federal policy to justify displacement of state law, id. at 1455.

In In re Hawaii Federal Asbestos Cases, the same court further argued that the Supreme Court's disapproval of a government contractor defense for procurements of stock helicopters by model number and of "any standard equipment" indicates that the defense should not apply to products readily available on the commercial market. 960 F.2d at 811 (quoting Boyle, 487 U.S. at 509, 510, 108 S. Ct. at 2517). The court stated that nonmilitary products do not involve the same highly complex and sensitive decisions as military products, but instead are manufactured in response to the broader needs and desires of private purchasers and already will have the costs of ordinary tort liability factored into their price. Id.

We respectfully disagree with the position of the Court of Appeals for the Ninth Circuit. Neither we nor the Supreme Court in Boyle have suggested that the federal interest in procurement contracts is sufficient, by itself, to justify the government contractor defense. The three-prong test specifically distinguishes those procurement contracts which involve discretionary functions of government from those which do not. Boyle, 487 U.S. at 512-13, 108 S. Ct. at 2518-19. Satisfaction of the test insures that the manufacturer is immune only when the government exercised discretion with respect to the dangers in a product's design. Id. at 512, 108 S. Ct. at 2518. By way of example, the Court stated that if the government ordered by model number a quantity of stock helicopters equipped with a hatch opening outward, the government would not have a significant interest in that particular feature. Id. at 509, 108 S. Ct. at 2517. This example indicates that the government does not perform a discretionary function when it orders standard equipment without regard to the particular design feature which may pose a danger. It is the exercise of discretion by the government in approving a product design, and not whether the product was military or nonmilitary in nature, which determines whether the government contractor defense is appropriate.

We are aware that some significant federal interests, such as national security, are unique to military procurement contracts. But

323

other significant federal interests, such as preventing judicial second-guessing of the government's public policy decisions, and limiting the government's financial burdens, are implicated in both military and nonmilitary procurements and formed the basis of the holding in Boyle. The government's selection of designs for nonmilitary products sometimes can involve decisions that are as complex and sensitive as the selection of military products. Though the holding of Boyle specifically applied to military contractors, id. at 502, 108 S. Ct. 5313, and the Court several times mentions the federal interest in military equipment designs, id. at 511-12, 108 S. Ct. at 2518, the Court was merely answering the narrow question before it rather than foreclosing the possibility of a government contractor defense for nonmilitary contractors. The rationale underlying the Court's holding—protection of the federal interest embodied in the discretionary function exception to the FTCA, id. at 513, 108 S. Ct. at 2519—applies to military and nonmilitary procurement contracts alike. We therefore hold that the government contractor defense is available to the manufacturers of nonmilitary products as a matter of federal common law.

## III.

We now consider whether defendant Wheeled Coach has satisfied the three-prong test of the government contractor defense. The defendant bears the burden of proving each element of the defense. Beaver Valley Power Co. v. National Eng'g & Contracting Co., 883 F.2d 1210, 1217 n.7 (3d Cir. 1989). Where a defendant has moved for summary judgment, it must establish that there is no genuine issue of material fact as to each element of the defense. Id.

## A.

The first prong of the government contractor defense requires that the United States approved reasonably precise specifications. Boyle, 487 U.S. at 512, 108 S. Ct. at 2518. Though it is necessary only that the government approve, rather than create, the specifications, see Koutsoubos, 755 F.2d at 355, in this case the government itself created and approved the specifications for the allegedly defective ambulance.

The GSA solicited bids for the construction of an ambulance pursuant to the terms of GSA Solicitation No. FCAP-X6-70785-N-12-9-86. The solicitation requires that the ambulance be built in

compliance with the Federal Specifications for the "Star-of-Life Ambulance," KKK-A-1822B, dated June 1, 1985. Wheeled Coach was awarded the project and entered into a contract with the GSA. The text of the contract consists of the solicitation form itself, App. at 22-156, and incorporates the ambulance specifications, App. at 157-83A. Both documents were exhibits in support of Wheeled Coach's summary judgment motion. Together, they describe in exhaustive detail the design of the ambulance, including the vehicle's dimensions and weight, mechanical systems, and equipment to be carried on board.

With respect to the ambulance's center of gravity, the design feature at issue in this case, the specifications state that "[t]he ambulance manufacturer shall locate the center of gravity (CG) of the ambulance/ambulance body to determine and assure the purchaser that the CG of the completed ambulance complies to the 'CG' parameters set by the chassis manufacturer." App. at 161. The government specifications require compliance with, and thus incorporate, the guidelines of the manufacturer of the van chassis. The manufacturer is the Ford Motor Company. The guidelines issued by Ford with its incomplete 1987 E-350 6.9 liter diesel van chassis state that the vertical distance from the ground to the completed vehicle center of gravity should not exceed 43 inches for vehicles equal to or greater than 8,000 pounds. App. at 243. Although these guidelines permitted Wheeled Coach to place the center of gravity anywhere below the maximum height of forty-three inches, the government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply. Wheeled Coach established as a matter of law that the government approved reasonably precise specifications, satisfying the first prong of the government contractor defense.

## B.

The second prong of the government contractor defense requires that the product manufactured by the defendant conformed to the government's specifications. Boyle, 487 U.S. at 512, 108 S. Ct. at 2518. In support of its motion for summary judgment, Wheeled Coach submitted the affidavits of its government sales manager Paul Holzapel and its mechanical engineering supervisor Robert Carlton. The Holzapel affidavit states that Wheeled Coach built the

ambulance in absolute compliance with the GSA's specifications. The completed ambulance was inspected by a GSA quality assurance inspector, who determined that the ambulance complied with contract specifications and released it for shipment to the Virgin Islands. App. at 194-97; see also id. at 187-88 (Notice of Inspection and U.S. Government Bill of Lading). The Carlton affidavit states that the ambulance was manufactured according the government's specifications, and that Carlton performed tests and measurements on the ambulance indicating that the height of its center of gravity is 36.5 inches above ground level, which meets the government's requirement that it be no higher than 43 inches. Id. at 241-42.

Plaintiff Carley offered no affidavits or other evidence in opposition to Wheeled Coach's motion for summary judgment. We conclude that Wheeled Coach established as a matter of law that the ambulance conformed to the government's specifications, satisfying the second prong of the government contractor defense.

## C.

■■ The third prong of the government contractor defense requires that the supplier warned the United States about the dangers in the use of its product that were known to the supplier but not to the United States. Boyle, 487 U.S. at 512, 108 S. Ct. at 2518. The district court took judicial notice "of the fact that the government conducts numerous crashworthiness tests, and the well known rollover problems of vehicles having a high center of gravity." App. at 247. The court concluded that the third prong therefore was satisfied because Wheeled Coach could not have been more aware than the government of the ambulance's tendency to rollover. We disagree. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The facts judicially noticed by the district court are not beyond reasonable dispute and therefore do not satisfy Rule 201(b).

The government may perform various tests on vehicles, but the quantity and nature of those tests are not matters of common knowledge, nor are they readily provable through a source whose accuracy cannot reasonably be questioned. Likewise, the district court could not have determined, beyond reasonable dispute, that

326

the rollover propensities of vehicles with high centers of gravity are well known. Most people probably know little, if anything, about how high centers of gravity cause vehicular accidents. The facts judicially noticed by the district court are not the kind of readily ascertainable facts that satisfy Rule 201(b). See, e.g., Policeman's Benevolent Ass'n v. Washington Twp., 850 F.2d 133, 137 (3d Cir. 1988) (court of appeals took judicial notice of township's police regulations), cert. denied, 490 U.S. 1004, 109 S. Ct. 1637 (1989); Government of the Virgin Islands v. Testamark, 528 F.2d 742, 743 (3d Cir. 1976) (no error to take judicial notice of court records indicating defendant's prior conviction). But see Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 494-95 n.40 (3d Cir.) (court could not take judicial notice that standardizing of autosound systems was prevalent in the automotive industry), cert. denied, — U.S. —, 113 S. Ct. 196 (1992).

█ Aside from the judicially noticed facts, there is no evidence on record showing that Wheeled Coach warned the GSA about dangers in its ambulance that were known to Wheeled Coach but not to the GSA. Wheeled Coach only offered the evidence which we have deemed sufficient to satisfy the first two prongs of the three-part test. Though plaintiff Carley submitted no affidavits or other evidence in opposition to Wheeled Coach's motion for summary judgment, her failure to respond did not relieve Wheeled Coach of its burden of proving its entitlement to summary judgment. See Fed. R. Civ. P. 56(e); Beaver Valley Power Co., 883 F.2d at 1217 n.7. Wheeled Coach failed to meet its burden.

Wheeled Coach argues that in the absence of any evidence opposing its motion, it established the government contractor defense by showing that it built the ambulance in accordance with the government's specifications. Wheeled Coach, in effect, argues that its satisfaction of the first two prongs of the defense also satisfies the third prong. We disagree.

█ The third prong of the government contractor defense prevents the displacement of state law where the manufacturer has built a product according to the government's specifications but has not informed the government of known risks. Boyle, 487 U.S. at 512-13, 108 S. Ct. at 2518-19. The Supreme Court specifically adopted the third prong to prevent manufacturers from having an incentive to withhold knowledge of risks. Id. A manufacturer,

therefore, cannot be relieved of the responsibility of proving all three elements of the government contractor defense.

Furthermore, this court consistently has refused to hold that the government contractor defense is established as a matter of law absent a substantial showing that the manufacturer informed the government of known risks in the use of its product. See Maguire, 912 F.2d at 72 (summary judgment affirmed where unrebutted deposition testimony and engineering memorandum indicated that manufacturer disclosed known safety risks to Army); In re Air Crash Disaster at Mannheim Germany, 769 F.2d 115, 124-25 (3d Cir. 1985) (uncontradicted testimony about two prior accidents, and Army's specific rejection of modification proposed by manufacturer to correct accident-causing defect, established Army's knowledge of safety risks and entitled manufacturer to judgment n.o.v.), cert. denied, 474 U.S. 1082, 106 S. Ct. 851 (1986); cf. Brown v. Caterpillar Tractor Co., 696 F.2d 246, 254-56 (3d Cir. 1982) (summary judgment in favor of manufacturer reversed where contract between manufacturer and Army was unclear as to whether protective canopy had to be installed on tractor-bulldozer). Unlike in Maguire and In re Air Crash Disaster, the record in this case is devoid of communications between Wheeled Coach and the GSA pertaining to the risks of high centers of gravity. Nor is there any other competent evidence indicating that the government knew that the height of the ambulance's center of gravity might give the vehicle a dangerous propensity to rollover. The government ordered an ambulance with a center of gravity up to 43 inches above the ground and inspected the finished vehicle. These facts alone do not establish, as a matter of law, that the government knew as much as Wheeled Coach about the risks associated with the ambulance's center of gravity.[6] A genuine issue of material fact exists as

---

[6] Wheeled Coach argues that Bynum v. FMC Corp., 770 F.2d 556 (5th Cir. 1985). supports the grant of summary judgment. We disagree. In Bynum, plaintiff was injured by an alleged defect in a military cargo carrier manufactured by defendant FMC Corp. ("FMC"). The parties stipulated that the first two prongs of the government contractor defense were satisfied and that FMC knew of no patent dangers in its vehicle not known to the government. See id. at 577 & n.31 (applying four-prong test recognized in McKay, 704 F.2d at 451, in which second through fourth prongs are identical to Boyle test). FMC submitted the affidavit of its engineering manager, stating that FMC had no knowledge of any prior accident involving the alleged defect in the cargo car-

to whether Wheeled Coach informed the government of dangers in the use of its ambulance known to Wheeled Coach but not known to the government.

## IV.

We hold that the government contractor defense is available to nonmilitary contractors under federal common law, but a genuine issue of material fact exists as to whether Wheeled Coach satisfied the third prong of that defense by warning the government of dangers known to Wheeled Coach but not to the government. We therefore will reverse the grant of summary judgment and remand the case to the district court. If Wheeled Coach establishes at trial that it satisfied the third prong of the government contractor defense, then federal common law preempts state law and Wheeled Coach is not liable for the alleged design defect in its ambulance.

If Wheeled Coach fails to establish the government contractor defense, then the district court must determine whether Wheeled Coach is liable under state law. In that event, the district court will consider alternative defenses raised by Wheeled Coach and whether Virgin Islands or Florida law governs this case.[7] The district court need not decide, as Carley's appeal suggests, whether Virgin Islands law recognizes a government contractor defense or whether that defense applies to nonmilitary contractors, in light of our holding that the government contractor defense is available to nonmilitary contractors under federal common law.

BECKER, *Circuit Judge*, concurring and dissenting.

Using Boyle v. United Technologies Corp., 487 U.S. 500, 108 S. Ct. 2510 (1988), as a springboard, the majority has announced a sweep-

---

rier or similar vehicles which it manufactured. This affidavit, combined with the stipulations and the lack of any opposing affidavits, was sufficient to establish the third prong and sustain a grant of summary judgment. Id.

We need not decide whether, in our view, the evidence in Bynum would be sufficient to establish the third prong of the government contractor defense as a matter of law. We observe only that the defendant in Bynum offered a higher degree of proof in support of its summary judgment motion than did Wheeled Coach. In fact, Wheeled Coach offered no proof to satisfy the third prong, but instead merely relied upon the court's taking judicial notice that it had been satisfied.

[7] We do not find it necessary to decide Carley's appeal of the conflict of laws question decided by the district court.

ing rule of federal common law under which federal government contractors may share the government's immunity from tort liability. In my view, the majority has extended Boyle, which dealt only with contracts for *military* equipment and was premised on concerns unique to the military, far beyond its logical limits. In so doing, the majority has encroached on the domain of Congress and that of the states. I would hold the Boyle defense inapplicable to nonmilitary government contracts such as the one at issue.

In view of my conclusion, I must reach the question whether a government contractor defense applies here as a matter of state law. I believe that the plaintiff is judicially estopped from making her argument that Florida law rather than Virgin Islands law applies. I therefore look to Virgin Islands law, and conclude that the defense does not apply. In my view, an immunity rule for government contractors is inconsistent with the principles of strict products liability applied in the Virgin Islands. Accordingly, while I agree with the majority that the summary judgment order of the district court must be reversed and the case remanded, and in that respect concur in the judgment, I would direct the district court to conduct proceedings in the absence of either a federal or a Virgin Islands government contractor defense. To that extent, I respectfully dissent.

## I.

## A.

Boyle announced the following test for identifying when a military contractor may share the government's immunity from product liability:

> Liability for design defects in *military equipment* cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Boyle, 487 U.S. at 512, 108 S. Ct. at 2518 (emphasis added). In my view, Boyle does not lend itself to the majority's expansive reading, especially in light of the well-established principle that rules of federal common law should be narrowly drawn and imposed only in

rare circumstances where there is a "significant conflict" between a federal interest and the application of state law, see Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S. Ct. 1301, 1304 (1966); infra Part I.C.

I agree with the majority that the first step in the Boyle decision—the Court's conclusion that there is a "uniquely federal interest" in potential civil liability arising out of the performance of federal procurement contracts, see Boyle, 487 U.S. at 505-06, 108 S. Ct. at 2514-15—might apply to any government contract, military or nonmilitary. However, as Justice Scalia's opinion (for the Boyle majority) demonstrates, "[t]hat the procurement of equipment by the United States is an area of uniquely federal interest . . . merely establishes a necessary, not a sufficient, condition for displacement of state law." Id. at 507, 108 S. Ct. at 2516. Displacement of state law with federal common law is permissible only where there exists a "significant conflict . . . between an identifiable federal policy or interest and the operation of state law." Id. (citations omitted). I cannot agree with the majority's assertion that such a "significant conflict" is involved whenever the federal government exercises discretion in the context of an ordinary procurement contract. See Majority Typescript at 8, 9, 13-14.

In identifying the "significant conflict" at issue in Boyle, the Court looked first to the "discretionary function" exception of the Federal Tort Claims Act (FTCA), which immunizes federal employees and agencies from tort liability where the basis for the tort claim is the exercise of a "discretionary function or duty on the part of a federal agency or an employee of the government." 28 U.S.C. § 2680(b). After determining that the "selection of the appropriate design for military equipment used by our Armed Forces is assuredly a discretionary function within the meaning of this provision," 487 U.S. at 511, 108 S. Ct. at 2518, the Court spelled out the particular reasons for shielding *military* contractors from tort liability via federal common law, reasons which are either unique to or heightened in the military context. The Court explained that the design of military equipment "often involves not merely engineering analysis but judgment as to the balancing of many technical, military and even social considerations, *including specifically the trade-off between greater safety and greater combat effectiveness.*" Boyle, 487 U.S. at 511, 108 S. Ct. at 2518 (emphasis added).

Parsing this key portion of Boyle, the majority concludes that, aside from concerns about combat effectiveness, "all of the other

policy reasons cited by the Court in support of the government contractor defense are equally applicable to military and nonmilitary procurement." Majority Typescript at 9. This reading, in my view, distorts the Court's reasoning. While it may be true that some of the policy reasons mentioned by the Court in Boyle as part of the justification for shielding military contractors from tort liability (i.e., interests in protecting the government's discretionary decisions involving technical, economic or social concerns) may apply outside of the military context, see Majority Typescript at 9, these concerns do not create the same degree of conflict between a federal interest and the operation of state law that exists in the military context, where product safety must be balanced against national security.[1]

The courts are split on the question whether Boyle's federal government contractor defense can be extended to contracts for nonmilitary equipment. See Majority Transcript at 6 n.1. However, the only other federal court of appeals that has specifically addressed

---

[1] The majority's reliance on Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S. Ct. 413 (1940), as a basis for its extension of the Boyle defense to all government contracts is also, in my view, unavailing. See Majority Typescript at 6-7. In Yearsley, the Court barred a suit for damages based on the Takings Clause against a government contractor who had built a dam that had allegedly eroded the plaintiffs' land. But as the majority recognizes, see Majority Typescript at 6-7, the Court in Yearsley found that the contractor was an *agent* of the United States, and not a private contractor like the defendant in the case at bar. Yearsley, 309 U.S. at 20-21, 60 S. Ct. at 414; see also Dorse v. Armstrong World Industries, Inc., 513 So.2d 1265, 1268 n.4 (Fla. 1987) (entity may share governmental immunity under Yearsley only when performing activities within scope of true agency relationship with government); Reynolds v. Penn Metal Fabricators, Inc., 146 Misc. 2d 414, 416, 550 N.Y.S. 2d 811, 812 (Sup. 1990) (because defendant in Yearsley was in actual agency relationship with the government, Yearsley is distinguishable from case of private contractor seeking government immunity). It also bears noting that Yearsley was decided prior to the passage of the Federal Tort Claims Act in 1948, which drastically reduced the federal government's immunity from tort suits. Thus, Yearsley is of minimal relevance to the issue in this case. See Boyle, 487 U.S. at 524-25, 108 S. Ct. at 2525 (Brennan, J., dissenting).

Moreover, Yearsley was relied on in Boyle only to support the Court's preliminary conclusion that there is a "unique federal interest" in limiting civil liabilities that arise out of the performance of government procurement contracts. As I have discussed, I do not dispute the existence of a "unique federal interest" here. However, the existence of such an interest is not sufficient to justify the displacement of state law. See Boyle, 487 U.S. at 507, 108 S. Ct. at 2518.

the issue has refused to extend the defense to contracts for nonmilitary equipment.[2] In Nielsen v. George Diamond Vogel Paint Co., 892 F.2d 1450 (9th Cir. 1990), the Ninth Circuit held that the Boyle defense did not extend to a products liability suit brought by a civilian employee of the Army Corps of Engineers against a paint manufacturer for injuries incurred while painting a dam for the Corps. The defendants argued that they were entitled to summary judgment under Boyle because they manufactured the paint in accordance with government-approved specifications and did not know of any dangers that were unknown to the government. Rejecting this argument, the Ninth Circuit reasoned that, although the Supreme Court in Boyle based the government contractor defense in part on the policies behind the discretionary function exception to the FTCA, "the policy behind the defense remains rooted in considerations peculiar to the military." Nielsen, 892 F.2d at 1454.[3]

---

[2] The majority relies on two pre-Boyle cases, Burgess v. Colorado Serum Co., 772 F.2d 844 (11th Cir. 1985) and Boruski v. United States, 803 F.2d 1421 (7th Cir. 1986). Majority Typescript at 12–13. However, the majority fails to make clear that the federal courts in these pre-Boyle cases were applying *state* law versions of the government contractor defense (Burgess applied a government contractor defense under Alabama law, while Boruski applied the defense as a matter of Illinois law). These cases thus did not deal with the very different concerns involved when federal courts impose rules of federal common law to displace state law. See infra Part I.C.

Several post-Boyle decisions by the Fifth and Eleventh Circuits do suggest that those courts view the Boyle defense as extending to contracts for nonmilitary equipment. See Glassco v. Miller Equipment Co., 966 F.2d 641 (11th Cir. 1992); Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir.), cert. denied, 493 U.S. 935, 110 S. Ct. 327 (1989). However, these cases applied Boyle to military equipment and therefore did not specifically address or decide the issue.

[3] The Ninth Circuit recently reaffirmed its reading of Boyle as limited to government contracts for military equipment in In re Hawaii Fed. Asbestos Cases, 960 F.2d 806 (9th Cir. 1992). Asbestos manufacturers sought to invoke the Boyle defense to tort claims brought on behalf of individuals injured from exposure to asbestos dust while serving in the U.S. Navy. The court held that the asbestos insulation, although contracted for by the military, was not military equipment and therefore was not subject to the Boyle defense (which the court referred to throughout as a "*military* contractor defense"). The rule of federal common law articulated in Boyle, the court explained, immunizes contractors "only with respect to the military equipment they produce . . . [because] the military makes highly complex and sensitive decisions regarding the development of new equipment for military use." 960 F.2d at 811. Because

A number of courts have agreed with the Ninth Circuit's conclusion that Boyle applies only to contracts for military equipment. See In re Chateaugay Corp., 146 Bankr. 339 (S.D.N.Y. 1992) (Boyle defense not applicable to products liability suit brought by injured postal employee against manufacturer of allegedly defective postal vehicle); Pietz v. Orthopedic Equip. Co., 562 So. 2d 152, 155 (Ala. 1989) (Boyle defense is limited to military equipment), cert. denied, 498 U.S. 823, 111 S. Ct. 75 (1990); Reynolds v. Penn Metal Fabricators, Inc., 146 Misc. 2d 414, 550 N.Y.S. 2d 811 (Sup. 1990) (Boyle defense does not apply to government contractor responsible for manufacture of postal vehicle); In re New York City Asbestos Litig., 144 Misc. 2d 42, 46, 542 N.Y.S.2d 118, 121 (Sup. 1989) (Boyle defense does not apply to products liability claim involving asbestos used in material that was not strictly military equipment).[4] However, other courts have applied Boyle to contracts for nonmilitary equipment. See Johnson v. Grumman Corp., 806 F. Supp. 212 (W.D. Wis. 1992) (Boyle defense applies to procurement contract for mail delivery vehicle); Vermeulen v. Superior Court, Alameda County, 204 Cal. App. 3d 1192, 251 Cal. Rptr. 805 (1st Dist. 1988) (Boyle defense applies equally to military and nonmilitary government contracts).

I believe that the Ninth Circuit has adopted the sounder approach. It was the heightened federal interest in shielding government decisions involving the national security, and not merely the exercise of discretion by government officials, which justified the Supreme Court's decision in Boyle to take the extreme and rare step of displacing state law with a rule of federal common law. No

---

the asbestos insulation "was not manufactured with the special needs of the military in mind," id. at 812, the court held that the manufacturers could be exposed to tort liability, just as they would be had a private party, instead of the government, contracted for the insulation.

[4] The courts have not addressed with precision the issue of which products within the military context constitute "military equipment" under Boyle, and that issue is not before us here. See, e.g., Stout v. Borg-Warner Corp., 933 F.2d 331 (5th Cir.) (assuming without discussion that an Army air conditioning unit used to cool Hawk Missile System Mobile Repair Unit was military equipment and was therefore subject to Boyle defense), cert. denied, 112 S. Ct. 584 (1991); but see Hawaii Fed. Asbestos Cases, 960 F.2d 806 (9th Cir. 1992) (holding that asbestos insulation in Navy buildings was not military equipment and was therefore not subject to Boyle defense), discussed above, supra n.3.

such interest justifies the majority's decision in this case to extend the Boyle defense to all government contractors.[5]

### B.

The majority bases its decision to extend Boyle to nonmilitary government contracts in part on the premise that, if government contractors are subject to liability for design defects, they will pass the costs of that liability on to the government. See Majority Typescript at 7-9. Concern that the government may bear indirectly some of the liability costs of the products it purchases is not, in my view, a sufficient justification for displacing state law with a judge-made immunity rule for government contractors.

The Court did not suggest in Boyle, as the majority does here, that a "significant conflict" between federal interests and state law exists every time the costs of tort liability are passed on to the government by a government contractor. Rather, read in context, the cost concern articulated in Boyle was that the passing of liability costs for design defects from *military* contractors to the government would have the effect of second-guessing highly sensitive *military* decisions involving the balance between equipment safety and combat effectiveness. See Boyle, 487 U.S. at 511, 108 S. Ct. at 2518; supra Part I.A. In other words, the concern in Boyle about passing liability costs on to the government is meaningful because of its

---

[5] The majority suggests that Boyle's rejection of the Feres doctrine as the source of the government contractor defense, and the Court's reliance instead on the discretionary function exception to the FTCA, is a strong indication that the Supreme Court intended to extend the government contractor defense to all government contracts. See Majority Typescript at 7-8. I do not read Boyle that way. In Boyle, the Court explained that it could not rely on Feres as a basis for the government contractor defense because the Feres doctrine was both too broad and too narrow. The Court concluded that Feres was too broad in that it would immunize government contractors from suits by members of the armed services even when the products that caused their injuries were designed without government input. Conversely, the Court concluded that Feres was too narrow because it would only cover members of the armed services, and not civilians injured by military equipment. However, the Court did not suggest that an additional reason for avoiding Feres and looking instead to the discretionary function exception was that the discretionary function exception is not limited to the military context. As the Ninth Circuit explained, although the Court "changed the intellectual moorings of the defense from the Feres doctrine to the discretionary function exception [,] . . . the policy behind the defense remains rooted in considerations peculiar to the military." Nielsen, 892 F.2d at 1454-55.

relation to the acute federal interest in avoiding judicial interference with the design of military equipment.[6]

Indeed, the cost theory relied on by the majority proves too much, for every time the government purchases a product made in the private sector, potential liability costs (factored into the price) are passed on to the government. While I agree with the majority that "[t]he government would suffer this economic harm regardless of whether it procured a product for military or civilian use," Majority Typescript at 7, the likelihood that the government will bear indirectly the liability costs of the products it procures from the private sector does not justify the displacement of state law with a sweeping rule of federal common law. Cf. South Carolina v. Baker, 485 U.S. 505, 521, 108 S. Ct. 1355, 1365-66 (1988) (nondiscriminatory imposition of costs on private entities that pass them on to federal government does not unconstitutionally burden federal functions).

Moreover, the government contractor defense, by definition, applies only to design defects, and not to manufacturing defects. See Mitchell v. Lone Star Ammunition, Inc., 913 F.2d 242, 245 (5th Cir. 1990). As the court noted in Johnston v. United States, 568 F. Supp. 351, 357 (D. Kan. 1983), since liability for manufacturing defects is not shielded by the government contractor defense, the argument that the purpose of the defense is to prevent the passing of liability costs on to the government carries little weight.

Additionally, it is not certain that subjecting government contractors to liability for design defects necessarily results in significantly greater costs to the government. As Justice Brennan pointed out:

> The tort system is premised on the assumption that the imposition of liability encourages actors to prevent any injury whose

---

[6] The Court also invoked the cost concern in the first part of its analysis, explaining that "imposition of liability on government contractors will directly affect the terms of government contracts: either the contractor will decline to manufacture the design specified by the government, or it will raise its price. Either way, the interests of the United States will be directly affected." Boyle, 487 U.S. at 507, 108 S. Ct. at 2515-16. But the Court made this point only to support its preliminary conclusion that there is a "unique federal interest" in potential civil liabilities that arise out of the performance of federal government contracts. As I have explained, I agree that such an interest exists, but the existence of a "unique federal interest" is not sufficient to justify displacement of state law. See supra Part I.A; Boyle, 487 U.S. at 507, 108 S. Ct. at 2516.

expected cost exceeds the cost of prevention. If the system is working as it should, Government contractors will design equipment to avoid certain injuries (like the deaths of soldiers or Government employees) which would be certain to burden the Government.

487 U.S. at 530, 108 S. Ct. at 2528 (Brennan, J., dissenting); see also McKay v. Rockwell Int'l Corp., 704 F.2d 444, 457 (9th Cir. 1983) (Alarcon, J., dissenting) (contractors with better safety records will secure less expensive liability insurance and will pass those savings, as well as the benefits of greater safety, on to the government), cert. denied, 464 U.S. 1043, 104 S. Ct. 711 (1984); Johnston, 568 F. Supp. at 357 (same).

In short, the cost avoidance rationale does not justify the displacement of state products liability law with a federal judge-made immunity rule for all government contractors. In my view, the determination whether cost concerns justify the preemption of state tort law with a federal immunity rule for government contractors, and if so, the nature and scope of such a rule, lies in the domain of Congress.

## C.

The majority's decision to extend the Boyle defense to all government contractors flies in the face of the long-standing doctrine that federal common law may replace state law only in "few and restricted" instances. Wheeldin v. Wheeler, 373 U.S. 647, 651, 83 S. Ct. 1441, 1444 (1963); see also Miree v. De Kalb County, 433 U.S. 25, 32-33, 97 S. Ct. 2490, 2495 (1977); Wallis v. Pan American Petroleum Corp., 384 U.S. at 68, 86 S. Ct. at 1304. In my view, Congress, not the federal judiciary, is the proper institution to create a broad, policy-driven immunity rule for private government contractors.[7]

The Court's decision in Boyle to fashion a rule of federal common law shielding military contractors from tort liability was controversial. Justice Brennan argued forcefully in his dissent that legislators, not judges, should decide whether and to what extent private government contractors should share the government's immunity from tort liability:

---

[7] Congress has considered, but never passed, various versions of a federal government contractor defense. *See, e.g.,* H.R. 4765, 99th Cong., 2d Sess. (1986); S. 2441, 99th Cong., 2d Sess. (1986).

> Congress . . . has remained silent—and conspicuously so, having resisted a sustained campaign by Government contractors to legislate for them some defense. The Court—unelected and unaccountable to the people—has unabashedly stepped into the breach to legislate a rule denying Lt. Boyle's family the compensation that the state assures them . . . . In my view, this Court lacks both the authority and the expertise to fashion such a rule . . . .

Boyle, 487 U.S. at 515-16, 108 S. Ct. at 2520-21 (Brennan, J., dissenting) (footnote omitted); see also id. at 531-32, 108 S. Ct. at 2528-29 (Stevens, J., dissenting) (arguing that the legislature is better equipped to create an entirely new, policy-driven rule); Michael D. Green and Richard A. Matasar, *The Supreme Court and the Products Liability Crisis: Lessons from Boyle's Government Contractor Defense*, 63 S. Cal. L. Rev. 637, 714-26 (1990) (arguing that Congress, rather than the Court, is the proper institution to establish a federal government contractor defense); Paula G. Curry, Note, *Expanding Federal Interests and Diminished Plaintiff Rights: The Government Contractor Defense*, 31 B.C. L. Rev. 337, 371-73 (1990) (arguing that Boyle Court should have left the creation of a novel federal government contractor defense to Congress).

Although the Supreme Court in Boyle may have taken a controversial step, the majority today takes a giant leap, exponentially expanding the reach of Boyle. In so doing, the majority seems to ignore the long-standing principle that

> [t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress.

Milwaukee v. Illinois, 451 U.S. 304, 312-13, 101 S. Ct. 1784, 1790 (1981); see also Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").

Congress has not, as yet, decided to immunize government contractors from tort liability. See supra n.7. Nor are there "clear and substantial interests of the National Government, which . . . will suffer major damage if the state law is applied," United States v.

Yazell, 382 U.S. 341, 352, 86 S. Ct. 500, 507 (1966), to hold nonmilitary government contractors liable for design defects. As I have discussed, an acute national interest in shielding government decisions regarding the design of military equipment justified the creation of a limited rule of federal common law in Boyle. But here the majority has articulated no such substantial national interest to justify immunizing manufacturers of nonmilitary equipment through a rule of federal common law.

## II.

Because I would hold that Boyle's federal government contractor defense does not apply to the defendant in this case, I must consider whether a government contractor defense is available to the defendant as a matter of state law.

I address the plaintiff's choice of law argument only briefly. Carley argues on appeal that the court erred in applying the law of the Virgin Islands (the place of injury) and instead should have applied the law of Florida (the place of manufacture).[8] Without reaching the merits of Carley's choice of law argument, I would hold that Carley is judicially estopped from making her choice of law argument. Not only did Carley fail to raise the argument until *after* the district court granted summary judgment, but she had previously argued in her Memorandum in Opposition to Defendant's Motion for Summary Judgment that Virgin Islands law *should* be applied (rather than federal common law under Boyle). Only after the district court held that "Virgin Islands law should incorporate the government contractor defense if it has not already done so," did Carley submit that Florida law should be applied. This court has "consistently held that judicial estoppel precludes a party from assuming a position in a legal proceeding inconsistent with one previously asserted." Government of Virgin Islands v. Paniagua, 922 F.2d 178, 183 (3d Cir. 1990); see also Muslin v. Frelinghuysen Livestock Managers, Inc., 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (acquiescence in court's choice of law amounts to waiver of any objection

---

[8] Because the district court was unsure whether the applicability of the government contractor defense was governed by federal or state law, the court held that the defense was available as a matter of *either* federal or Virgin Islands law. The court then concluded that the same three-pronged defense set out in Boyle applies to all government contractors under Virgin Islands law.

to such choice). Given this scenario, I believe Carley is judicially estopped from arguing that Florida law should apply.

Accordingly, I will address whether a government contractor defense exists as a matter of Virgin Islands law. I note preliminarily that the question whether a government contractor defense exists as a matter of Virgin Islands law is different from whether such a defense exists as a matter of federal common law, see supra Part I. As I have discussed, long-standing principles of federalism restrict the authority of federal courts to displace state law with judge-made rules of federal common law. See supra Part I.C. Such federalism concerns do not come into play when this court, sitting as the Supreme Court of the Virgin Islands, is asked to decide whether some version of the government contractor defense applies as a matter of Virgin Islands common law.

## III.

There is no Virgin Islands precedent for application of a government contractor defense.[9] Section 402A of the Restatement (Second) of Torts, which governs strict products liability in the Virgin Islands, see Murray v. Fairbanks Morse, 610 F.2d 149, 154 n.8 (3d Cir. 1979); V.I. Code Ann. tit. I, § 4 (1967),[10] is silent on whether such a defense may be applied to a strict liability claim, and there is no Virgin Islands statutory law on this issue. Thus, I must look to the general tenets of strict liability law in the Virgin Islands and to the rationales for the government contractor defense to determine whether adoption of the defense as a matter of Virgin Islands common law is warranted. See Polius v. Clark Equipment Co., 802 F.2d 75, 80 (3d Cir. 1986) ("In our role as the Supreme Court of the Virgin Islands . . . when the Restatement does not control, we must apply the law which represents the better approach, be that the minority or majority rule.").

---

[9] Aside from the district court's offhand assertion in this case that Virgin Islands law should incorporate a government contractor defense, and a few lines of dicta in an unpublished district court opinion which similarly assumed without deciding that the defense applies (or should apply) in the Virgin Islands, see Nielsen v. Oshkosh Truck Corp., Civ. No. 1986/80, slip op. at 1–3 (D.V.I. Apr. 13, 1988), I am aware of no other Virgin Islands cases that mention the defense.

[10] V.I. Code Ann. tit. I, § 4 adopts the rules in the Restatements as the rules of decision in the Virgin Islands in the absence of local laws to the contrary.

340

Section 402A provides that if a person who is in the business of selling and/or manufacturing a product sells or manufactures the product "in a defective condition unreasonably dangerous to the user or consumer or to his property[, that person] is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property." Restatement (Second) of Torts § 402A. Liability is imposed even where "the seller has exercised all possible care in the preparation and sale of his product." Id.

In Murray v. Fairbanks Morse, this court, announcing Virgin Islands law, explained the policies behind § 402A:

> By focusing the legal inquiry on the product defect rather than the defendant's conduct and thereby easing the plaintiff's burden of proof, strict liability theory endeavors to place the risk of economic loss on the manufacturers of defective products, thereby spreading the loss and not saddling it solely on an innocent injured consumer. Because manufacturers bear the loss, strict liability also has the desirable effect of deterring manufacturers and sellers from introducing unsafe products into the stream of commerce.

610 F.2d at 158; see generally Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on Torts* § 98, at 692-94 (5th ed. 1984) (discussing the rationales for strict liability, including cost spreading, compensating injured parties, and deterring sale of unsafe products). Thus, § 402A, as applied in the Virgin Islands, places great emphasis on protecting potentially injured persons by providing compensation for injuries caused by design defects and by encouraging manufacturers and sellers to produce and sell safer products.

A rule that would immunize private manufacturers whose products conform to federal or state government specifications from strict liability for design defects would conflict with these policies. The most obvious effect of the government contractor defense is to place the full cost of accidents resulting from design defects on injured parties, thereby thwarting both the policy of compensating injured persons and the policy of risk-spreading. See generally Gail Rubin, Comment, *The Government Contract Defense in Strict Liability Suits for Defective Design*, 48 U. Chi. L. Rev. 1030 (1981) (arguing that the government contractor defense should not be applicable to bar strict liability claims for design defects). The defense also conflicts with the deterrence rationale behind strict liability: immuniz-

341

ing government contractors will give them little incentive to scrutinize government-provided or government-approved design specifications for potential dangers. See Ronald A. Cass & Clayton P. Gillette, *The Government Contractor Defense: Contractual Allocation of Public Risk*, 77 Va. L. Rev. 257, 260 (1991). Thus, unless the various rationales for the government contractor defense strongly outweigh the policies behind § 402A, I can see no justification for recognizing such a defense as a matter of Virgin Islands common law.

In applying the government contractor defense, courts have explained that it is simply not fair to impose tort liability on a government contractor who has merely complied with government specifications and therefore is not at fault. See, e.g., Vanchieri v. New Jersey Sports & Exposition Authority, 104 N.J. 80, 85-86, 514 A.2d 1323, 1326 (1986); In re "Agent Orange" Prod. Liab. Litig., 506 F. Supp. 762, 793 (E.D.N.Y. 1982). However, as I have noted, strict liability law in the Virgin Islands is not based on negligence or faulty conduct. "[L]iability is imposed on the defendant even if it has exercised 'all possible care in the preparation and sale of [its] products.'" Murray v. Fairbanks Morse, 610 F.2d at 156 (citing Restatement (Second) of Torts § 402A(2)(a)); see also Acosta v. Honda Motor Co., 717 F.2d 828, 835 (3d Cir. 1983) ("The touchstone of § 402A . . . is that the character of the manufacturer's conduct is essentially irrelevant to its liability—only the condition of the product is to be considered by the trier of fact.").[11] In fact, strict

---

[11] I note in this regard that the government contractor defense should not be confused with the similar, though analytically distinct, "contract specifications defense." The latter defense applies to *negligence* claims involving products that are manufactured to the order and specifications of another party (private or governmental). The commentary to § 404 of the Restatement, which deals with negligence, explains that where a contractor simply follows the design specifications of another, the contractor "is not subject to [negligence] liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe." Restatement (Second) of Torts § 404, cmt. a. Because the contract specifications defense is grounded in negligence (and is discussed in the Restatement only in the context of negligence), it should have no application to strict liability claims, where faulty conduct on the part of the seller or manufacturer is irrelevant. Several courts have so held. See, e.g., Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 739 (11th Cir. 1985), cert. denied, 487 U.S. 1233, 108 S. Ct. 2896 (1988); Challoner v. Day & Zimmermann, Inc., 512 F.2d 77,

liability for design defects applies to sellers and distributors even though they may not have actually manufactured the allegedly defective product.[12] Thus, in my view, the fairness rationale for the government contractor defense carries little weight in the strict liability context. Accord Challoner v. Day & Zimmermann, Inc., 512 F.2d 77, 83 (5th Cir. 1975), vacated and remanded on other grounds, 423 U.S. 3, 96 S. Ct. 167 (1975). At all events, the notion that holding government contractors liable for designs specified by the government is unfair does not outweigh, in my view, the policies of victim compensation, cost-spreading and deterrence that underpin § 402A.

The doctrine of sovereign immunity is also considered a rationale for application of the government contractor defense. See, e.g., Beaver Valley Power Co. v. National Eng'g & Contracting Co., 883 F.2d 1210, 1215-15 (3d Cir. 1989); Mackey v. Maremont Corp., 350 Pa. Super. 415, 504 A.2d 908, 911 (1986). Although the Virgin Islands Legislature has waived the government's sovereign immunity from personal injury claims alleging negligence or a wrongful act or omission, this waiver does not apply to strict liability claims. See V.I. Code Ann. tit. 33, § 3408 (1992).[13] The United States government is also immune from strict liability. See Laird v. Nelms, 406 U.S. 797, 92 S. Ct. 1899 (1972). Some courts have explained that the government's immunity from strict liability for design defects would be meaningless if a private contractor who simply fulfills the terms of a government-approved contract cannot share the immunity. See, e.g., Nielsen, 892 F.2d at 1456 ("Courts often absolve contractors from liability when following government specifications . . . because of their reluctance to impose liability . . . when the government itself would be immune from suit.").

---

83 (5th Cir.), vacated and remanded on other grounds, 423 U.S. 3, 96 S. Ct. 167 (1975); Johnston v. United States, 568 F. Supp. at 354; Dorse, 513 So.2d at 1267.

[12] Restatement (Second) of Torts § 402A, cmt. c. provides in part:
The rule . . . applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor . . . . The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons or property.

[13] Moreover, the Virgin Islands' waiver of sovereign immunity is limited to $25,000. See V.I. Code Ann. tit. 33, § 3411 (1992).

I am not persuaded. The best explanation for the application of sovereign immunity today is that by restricting suits brought directly against the government, judicial interference with governmental policy-making is minimized. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703-04, 69 S. Ct. 1457, 1468 (1949). But there is a significant difference between subjecting the government directly to tort liability claims and allowing such claims against private government contractors. "Surely suits against government contractors will have a less pronounced effect on government officials' decisions than suits against those officials personally, even if the costs of the former are passed on to the government." Green & Matasar, 63 S. Cal. L. Rev. at 716; see also Dorse, 513 So.2d at 1268 & n.4 (a private entity acting as an independent government contractor and not as an agent of government logically cannot share the government's immunity); Jeremy Travis, Note, *Rethinking Sovereign Immunity*, 57 N.Y.U. L. Rev. 597, 618-19 (1982).

Tied up with the sovereign immunity rationale for the government contractor defense is the concern that if government contractors are subject to liability for design defects, they will pass the costs on to the government, whereas if the government itself had made the product, it would be immune from such liability. See, e.g., Majority Typescript at 7-9, (relying on cost rationale as basis for extending the federal government contractor defense to all government contractors); Vanchieri, 514 A.2d at 1326 ("If contractors never shared government immunity. their costs of doing business would be higher and those costs would be passed on to the government entities hiring the contractors."); Mackey, 504 A.2d at 911 (government contractor defense "encourages lower costs to the government on competitive bids"). For the reasons discussed above, supra Part I.B., I am not persuaded that an interest in cutting government costs justifies immunizing private government contractors from liability for design defects. In my view, the strong policy interests behind the application of strict liability for design defects (compensation of injured victims, cost-spreading, and deterring unsafe products) outweigh any putative lowering of the cost of government procurement that might result from immunizing government contractors.

In short, none of the rationales for the government contractor defense outweigh the policies behind § 402A so as to convince me that the defense should be applied as a matter of Virgin Islands

344

common law. Therefore, while I agree with the majority that the summary judgment order of the district court must be reversed and the case remanded, and to that extent concur in the judgment, I would direct the district court to conduct proceedings in the absence of either a federal or a Virgin Islands government contractor defense.